IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| DEE NEUKRANZ, et al., § § Plaintiffs, § § v. § CONESTOGA SETTLEMENT § SERVICES, LLC, et al., § § Defendants. § | Civil Action No. 3:19-CV-1681-L (Consolidated with 3:21-CV-568-L) Referred to U.S. Magistrate Judge[1] |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Before the Court for recommendation are *Defendant Provident Trust Group, LLC's Motion to Dismiss Amended and Consolidated Complaint and to Strike Class Allegations and Brief in Support*, filed June 6, 2021 (doc. 163); *Defendants Conestoga Settlement Services, LLC, Conestoga International, LLC; Conestoga Trust Services, LLC; and Michael McDermott's Motion to Dismiss Plaintiffs' Amended and Consolidated Complaint (doc. 147)*, filed June 18, 2021 (doc. 165); and *Defendants Conestoga Settlement Services, LLC, Conestoga International, LLC; Conestoga Trust Services, LLC; and Michael McDermott's Motion to Stay Pending Arbitration*, filed July 1, 2021 (doc. 169). Based on the relevant filings and applicable law, the motion to stay should be **GRANTED**, and the two motions to dismiss should be **DENIED without prejudice**.

### I. BACKGROUND

A nationwide class of investors with fractional interests in certain life settlement contracts (Plaintiffs) sues Conestoga Settlement Services, LLC, Conestoga International, LLC, Conestoga Trust Services, LLC (Trust Services) (collectively Conestoga); L.L. Bradford and Company, LLC

---

[1] By order filed November 1, 2019, this case has been referred for full case management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions. (*See* doc. 52.)

(Bradford); Provident Trust Group, LLC (Provident); James Settlement Services, LLC (JSS); and Michael McDermott (McDermott) (collectively Defendants). (doc. 147.)[2]

A.   **Factual Background**

A life settlement contract is a transaction in which an insured person sells his or her life insurance policy to a third party for less than its face value. (*Id.* at 14.) The purchaser of a life insurance policy becomes the new beneficiary and has the right to collect the benefits payable upon the death of the insured, but must pay policy premiums until maturity, or the policy lapses. (*Id.* at 14-15.) Conestoga, which was founded by McDermott, acquired life insurance policies on non-party individuals to be held in a trust (Conestoga Trust); it then marketed and sold fractional interests in life settlement contracts on those policies to investors through a multilevel marketing network of independent sales representatives. (*Id.* at 15.) Sales commissions were paid to the sales representative who made the sale, as well as to each person in the representative's "upline." (*Id.* at 24.)

Investors were provided with substantially similar documents about the Conestoga investments, including a Policy Selection Sheet (PSS) and a Private Placement Memorandum (PPM). (*Id.* at 19, 27.) The PSS was a chart containing key information about the policies, including amount invested, purported life expectancy, premium reserve period, payout at maturity, and estimated annual premium cost. (*Id.* at 20.)[3] The PPM described the investment features, benefits, and risks inherent in purchasing fractional interests in Conestoga life settlement contracts. (*Id.* at 27-28.) Investors were told that a portion of their investments would be placed into escrow accounts; "the money in those

---

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

[3]JSS, which sold the policies to Conestoga, provided the life expectancy and premium reserve data for the policies, and calculated the minimum average cost of annual premiums necessary to maintain them. (*Id.* at 35.)

accounts would be used to pay premiums on the policies for the life expectancy of the insured person plus an additional period, which was at least one year and often more." (*Id.* at 18.)

Provident is a business that specializes in overseeing retirement investment accounts; until in or around 2015, it was the "independent escrow agent" of the escrow accounts for the Conestoga investments. (*Id.* at 31, 33-34.) In this role, it would receive and hold investor funds, disperse any fees and commissions, pay the required premiums on the policies, and distribute the proceeds to investors when a policy matured. (*Id.* at 33.)

In October 2013, Lloyd William Neukranz opened a traditional Individual Retirement Account (IRA) with Provident and transferred funds to be invested in eleven Conestoga life settlement contracts. (*Id.* at 99.) Upon his death in 2019, the Conestoga investments became assets of his estate (Estate), of which his wife, Dee Neukranz, is the heir and administrator. (*Id.* at 99-100.) A few months later, Mrs. Neukranz executed an agreement containing an arbitration provision to open her own personal IRA with Provident; the Conestoga investments were included in her portfolio. (docs. 10 at 24-27; 105 at 2-3.)[4]

None of the investors has broken even on the Conestoga investments, and the information provided on life expectancy and premium costs for the policies was "grossly inaccurate," as few policies have timely matured, additional premiums are being incurred earlier than represented, and "the amount of premiums has far exceeded what was quoted." (doc. 147 at 4.) "Less than ten of the 59 policies in Conestoga's portfolio matured within the stated life-expectancy period." (*Id.* at 30.)

---

[4]As discussed below, some investors had executed similar agreements to open retirement accounts with Provident and purchased fractional interests in the Conestoga policies through those accounts. (*See* docs. 147 at 40 n.3; 169 at 20.)

B.  **Procedural History**

On June 4, 2019, Mrs. Neukranz, on behalf of herself, the Estate, and a putative class of persons who invested in Conestoga life settlement contracts, filed a class action lawsuit in Texas state court against Conestoga, Bradford, Provident, and McDermott. (doc. 1-4.)[5] After the state action was removed to the Northern District of Texas, Mrs. Neukranz's individual claims against Provident were ordered to arbitration for determination of whether her claims fell within the scope of the arbitration agreement, and the remainder of the case was stayed. (docs. 132, 137.) The arbitrator subsequently ruled that Mrs. Neukranz's claims are within the scope of arbitration. (doc. 141 at 1.)

In her arbitration demand, Mrs. Neukranz asserted claims against Provident for breach of fiduciary duty and for an accounting. (*See* doc. 175-1.) She alleged that she and her husband were provided a PSS that described each of their Conestoga investments, and that "[m]uch of th[e] information in the PSS related to the escrow accounts, which were supposed to be managed by Provident." (*Id.* at 3.) "As the escrow agent, Provident was required to establish the escrow accounts for [their] benefit," "to pay the premiums owed on each investor's throughout the escrow reserve period in accordance with the PSS," and "to carefully manage the funds held in escrow for their benefit." (*Id.* at 4.) Mrs. Neukranz and her husband were unaware that "(1) the premiums owed on the policies were actually much higher than represented in the PSS and the premium amounts were not fixed (instead, they increased substantially over time); (2) Provident either never established the escrow accounts or never sufficiently funded the escrow accounts to pay the premiums actually owed over the represented escrow reserve period (i.e., the expected life of the insureds plus the stated grace period); (3) Provident also used the escrow funds to pay exorbitant premiums that far exceeded the

---

[5] Strategix Solutions, Ltd. was also sued, but it is not named as a defendant in the amended consolidated complaint. (*See* doc. 147.)

amounts authorized in the PSS, without notifying [them]; and (4) Provident also wrongfully used the escrow funds to pay unauthorized commissions, fees, and expenses to undisclosed persons and in amounts that exceeded what had been authorized." (*Id.* at 4.)

The arbitration demand asserts that Provident "breached its fiduciary duties by, among other things, spending funds from the escrow accounts for purposes (and in amounts) that were not disclosed to or authorized by the beneficiaries; by failing to establish the escrow accounts and/or failing to adequately fund the escrow accounts as represented; failing to disclose that the escrow accounts were depleting much faster than expected such that the funds would not be sufficient to cover the premiums over the escrow reserve period; engaging in self-dealing; paying itself and others excessive and undisclosed fees and commissions; and abandoning its fiduciary responsibilities as escrow agent without notifying beneficiaries." (*Id.* at 5-6.) "Provident also breached its fiduciary duties by failing to disclose its conflicts of interest, including, but not limited to, the fact that while it was serving as Claimant's escrow agent, it was also taking direction from Conestoga and its principals regarding administration of the escrowed funds and payment of commissions out of those funds." (*Id.* at 6.) The arbitration demand seeks damages for those breaches of fiduciary duty, as well as a full accounting of all funds that Provident managed on behalf of Mrs. Neukranz and her husband. (*Id.* at 6-7.)

On September 16, 2020, approximately eighty additional Conestoga investors filed a separate class action lawsuit in the Southern District of Nevada, which was later transferred to the Northern District of Texas. *See Lane et al. v. Conestoga Settlement Services, LLC et al.*, Case No. 2:20-CV-01716-APG-BNW (Nevada Action). On April 12, 2021, this case was reopened, and the Nevada Action was consolidated with this case. (docs. 138, 139.) On May 3, 2021, Plaintiffs filed their amended consolidated complaint on behalf of a nationwide class of Conestoga investors against

5

Defendants. (*See* doc. 147.)[6] It asserts fraud and fraud by non-disclosure claims against Conestoga, McDermott, and JSS, a breach of fiduciary duty claim against Trust Services, and declaratory judgment against Conestoga and McDermott; the plaintiffs who did not use a Provident IRA to invest with Conestoga assert a breach of fiduciary duty claim against Provident; and some of the plaintiffs assert federal securities fraud claims against Conestoga, JSS, and McDermott. (*Id.* at 100-09.)[7]

The amended consolidated complaint alleges that Conestoga, JSS, and McDermott made material misrepresentations in the PSS concerning "the life expectancies, premium reserve periods, estimated annual premiums, expected payouts at maturity, and age when premium calls would begin," and that they misrepresented that "sales commissions would be limited to certain amounts and only paid to certain persons." (*Id.* at 101, 106.) It also alleges that they failed to disclose material facts to potential investors, including, among other things, "that the insurance companies could and would increase the costs of insurance and annual premiums on the policies; that the policy illustrations for the policies showed that the annual premiums would increase substantially over time; that the escrow reserves would be insufficient to pay these increased premiums; that the life expectancies were systematically understated and substantially less than the Social Security data indicated; that the

---

[6] The investors fall within three subclasses: (1) investors whose PSS is dated more than five years before the filing date of the Nevada Action (Non-Securities Fraud Class); (2) investors whose PSS is dated five years or less before the filing date of the Nevada Action (Securities Fraud Class); and (3) investors who did not use a Provident IRA to invest with Conestoga (Non-IRA Class). (doc. 147 at 39-40.) According to the amended consolidated complaint, the questions of law or fact that are common to the class include "whether the PSS and written marketing materials contained fraudulent misrepresentations and omissions, whether the Conestoga entities and McDermott committed fraud with respect to the life expectancies and premium information, whether the misrepresentations and omissions were material to reasonable investors, whether reliance on those was representations was reasonable, and whether certain Defendants breached fiduciary duties to the class . . . whether the Court should grant a full accounting to the class and whether a receiver should be appointed to manage the Conestoga trust going forward." (*Id.* at 40.) It asserts that Plaintiffs' claims are typical of the claims of the class because they all had "purchased an interest in the life settlements under false pretenses based on the false and misleading statements and failures to disclose material facts," and "certain Defendants breached fiduciary duties to the Plaintiffs and others in the class." (*Id.*)

[7] The amended consolidated complaint also asserts a breach of fiduciary claim against Bradford. (*See* doc. 147.) A recommendation that the claims against him be dismissed without prejudice for lack of personal jurisdiction is currently pending. (*See* doc. 186.)

premium reserve period was substantially less than the life expectancy predicted by the Social Security data; that the investors were highly likely to incur additional premium payments on the policies; and that commissions would be paid to persons other than the investor's individual sales agents and in undisclosed amounts." (*Id.* at 102-03.)

The amended consolidated complaint also asserts that Trust Services owes fiduciary duties to the investors because it is the trustee of the Conestoga Trust, and that Provident owes fiduciary duties to the investors because "it was entrusted to serve as the 'independent escrow agent' for investors and supervise over the escrowed funds belonging to investors." (*Id.* at 104-05.)  It alleges that they "breached these fiduciary duties by, among other things, spending funds from the escrow accounts for purposes (and in amounts) that were not disclosed to Plaintiffs or authorized by Plaintiffs, improperly managing escrow funds, failing to disclose conflicts of interest, engaging in self-dealing, and paying themselves excessive and undisclosed commissions." (*Id.* at 105.)

On June 17, 2021, Provident moved to dismiss the claims against it under Rule 12(b)(6), and, in the alternative, to strike the class allegations against it. (doc. 163.) Plaintiffs responded on July 8, 2021, and Provident replied on July 22, 2021. (docs. 171, 174.)

On June 18, 2021, Conestoga and McDermott moved to dismiss all claims against them under Rule 9(b) and Rule 12(b)(6). (doc. 165.) Plaintiffs responded on July 9, 2021, and Conestoga and McDermott replied on July 23, 2021. (docs. 173, 176)

On July 1, 2021, Conestoga and McDermott moved to stay pending arbitration under the Court's inherent power. (doc. 169.) Plaintiffs responded on July 22, 2021, and Conestoga and McDermott replied on August 5, 2021. (docs. 175, 179.) On November 11, 2021, Conestoga and McDermott filed a supplemental brief, advising the Court that the 49 plaintiffs who used a Provident

7

IRA to invest with Conestoga have initiated arbitrations against Provident, and that they are all pursuing the same claims as Mrs. Neukranz in arbitration. (doc. 182 at 2-3.) Plaintiffs responded on December 3, 2021, and Conestoga and McDermott replied on December 9, 2021. (docs. 185, 191.)

## II. STAY PENDING ARBITRATION

Conestoga and McDermott seek to stay this case pending arbitration of the claims against Provident. (*See* doc. 169.)

**A.     Legal Standard**

The Federal Arbitration Act (FAA) governs the enforcement of arbitration agreements. *See* 9 U.S.C. §§ 2, 3. Section 3 of the FAA requires that upon application of one of the parties, the court shall stay the trial of the action until the arbitration is complete if there exists a valid and enforceable arbitration clause. *See id.* § 3. A stay is mandatory upon a showing that the opposing party has commenced suit "upon any issue referable to arbitration under an agreement in writing for such arbitration." *Id.*; *accord Mun. Energy Agency of Miss. v. Big Rivers Elec. Corp.*, 804 F.2d 338, 342 (5th Cir. 1986). While the FAA's mandatory stay provision normally only applies to the signatories of an arbitration agreement, the Fifth Circuit has recognized that "exceptional circumstances" may exist to warrant an exception to this general rule. *See Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001) (citing *Harvey v. Joyce*, 199 F.3d 790 (5th Cir. 2000) and *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324 (5th Cir. 1999)). Subsequently, the Fifth Circuit identified three factors that courts should consider in determining the applicability of the mandatory stay provision to nonsignatories:

> 1) the arbitrated and litigated disputes must involve the same operative facts;
> 2) the claims asserted in the arbitration and litigation are "inherently inseparable"; and
> 3) the litigation must have a "critical impact" on the arbitration.

*Rainier DSC 1, L.L.C. v. Rainier Capital Mgmt., L.P.*, 828 F.3d 356, 360 (5th Cir. 2016) (citing *Waste Management v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 (5th Cir. 2004)). "The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." *Waste Management*, 372 F.3d at 343.

Even if a non-signatory's request for stay is not warranted under § 3, the case may still be stayed "in accordance with the court's inherent authority." *Citgo Petroleum Corp. v. M/T Bow Fighter*, No. H-07-2950, 2009 WL 960080, at *5 (S.D. Tex. Apr. 7, 2009). The district court's authority to issue a discretionary stay of litigation pending arbitration, even as to claims between non-arbitrating parties, lies in the court's inherent power to control its docket. *See Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) (citing *Moses H. Cone Mem 'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n. 23 (1983)). The factors for granting a non-signatory's request for mandatory stay under the FAA are also considered in determining whether a discretionary stay is appropriate. *See, e.g., Mosaic Underwriting Serv., Inc. v. Moncla Marine Operations, L.L.C.*, No. 12-2183, 2013 WL 2903083, at *8 (E.D. La. June 12, 2013); *see also Broussard v. First Tower Loan, LLC*, No. CV 15-1161, 2016 WL 879995, at *6 (E.D. La. Mar. 8, 2016) ("Several courts in this circuit have relied on the factors discussed in *Waste Management* to determine whether a discretionary stay is appropriate.") (collecting cases). If the facts and claims underlying the arbitration and litigation "significantly overlap," a discretionary stay pending arbitration is appropriate, "[e]ven if the operative facts are not identical and the claims are not 'inherently inseparable.'" *Suzlon Infrastructure, Ltd. v. Pulk*, No. CIV. A. H-09-2206, 2010 WL 3540951, at *8 (S.D. Tex. Sept. 10, 2010); *see also Jones v. Singing River Health Sys.*, No. 1:14CV447-LG-RHW, 2016 WL 3351291, at *2 (S.D. Miss. June 15,

9

2016) ("District courts within the Fifth Circuit have held that it is not absolutely necessary that the claims be inherently inseparable in order to justify a discretionary stay; significant overlap of claims is sufficient.") (citations omitted); *Jones Walker, LLP v. Petaquilla Minerals, Ltd.*, No. 14-1203, 2015 WL 3772670, at *5 (E.D. La. June 17, 2015) ("A district court may exercise its discretion to impose a stay pending arbitration, even if the operative facts are not identical and the claims are not inherently inseparable, as long as the facts and claims forming the basis for the arbitration and litigation proceedings significantly overlap.") (quotations and citations omitted).

Here, the *Waste Management* factors argue in favor of a discretionary stay. *See Waste Management*, 372 F.3d at 343. Mrs. Neukranz and the plaintiffs who did not use a Provident IRA to invest with Conestoga assert the same breach of fiduciary duty claim against Provident based on its former role as escrow agent. (*See* docs. 147 at 104-05; 175-1 at 5-6.) The claims concern, among other things, Provident's management of the escrow funds held on behalf of the investors, its alleged breaches of the fiduciary duties owed to investors, the misrepresentations in the PSS and other documents provided to investors about the Conestoga investments, and the undisclosed relationships among the entities involved in the investments. (*See id.*) These are the same operative facts forming the basis of the claims asserted by the plaintiffs against the other defendants in the litigation, including the fraud-based claims against Conestoga and the separate breach of fiduciary duty claim against Trust Services. (*See* doc. 147 at 100-09.)

Plaintiffs do not dispute that there is significant overlap between the breach of fiduciary duty claims against Provident in the arbitration and litigation, but instead argue that the litigation claims against Conestoga are not based on the same operative facts as the breach of fiduciary duty claims against Provident. (doc. 175 at 11-13.) Even though the claims in the arbitration and litigation are not

"inherently inseparable," they are based on the same operative facts. As discussed, Plaintiffs assert fraud and fraud by non-disclosure claims against Conestoga, alleging that it made material misrepresentations or omissions to investors by, among other things, providing a PSS that misrepresented "the life expectancies, premium reserve periods, estimated annual premiums, expected payouts at maturity, and age when premium calls would begin," and misrepresenting that "sales commissions would be limited to certain amounts and only paid to certain persons." (doc. 147 at 101, 106.) In her arbitration demand, Mrs. Neukranz alleges that she and her husband were provided a PSS on the Conestoga policies, that Provident was required to establish escrow accounts and pay premiums "in accordance with the PSS," and that the PSS contained misrepresentations about the Conestoga investments. (doc. 175-1 at 3-4.) The PSS and the alleged misrepresentations and omissions of Conestoga and the other defendants are clearly central to the arbitration and litigation. The "close relationship" between the facts supporting all of the claims weighs in favor of a stay. *See Broussard v. First Tower Loan, LLC*, 150 F. Supp.3d 709, 728 (E.D. La. 2015) (quoting *Suzlon Infrastructure, Ltd.*, 2010 WL 3540951, at *8). Because some of the claims in the arbitration and litigation are the same, and all the claims in both disputes are based on the same operative facts, the first two *Waste Management* factors weigh in favor of a discretionary stay. *See Suzlon Infrastructure, Ltd.*, 2010 WL 3540951, at *8 ("Even if the operative facts are not identical and the claims are not 'inherently inseparable,' the facts and claims significantly overlap.").

The likely impact of this litigation on the arbitration, the third *Waste Management* factor, provides further support for a discretionary stay. *See Waste Management*, 372 F.3d at 345 (explaining that "[g]iven the binding effect of a federal judgment," proceeding with litigation would "substantially impact" pending arbitration of factually similar claims because "[the] arbitrator would necessarily be

11

strongly influenced to follow the court's determination"). There is significant overlap among the facts and claims in the litigation and arbitration, and the same witnesses and evidence will likely be necessary to prove the breach of fiduciary duty claim against Provident, particularly in regard to the PSS, the alleged misrepresentations or omissions regarding the Conestoga investments, and the alleged fiduciary duties breached by Provident. *See, e.g., Citgo Petro. Corp.*, 2009 WL 960080, at *7 (issuing a stay under the court's inherent authority because the claims in the litigation arose "from the same incident between two pairs of the same three parties" in the arbitration). Given the strong relationship between the facts and claims in the arbitration and litigation, allowing this case to proceed runs the risk of conflicting decisions on common issues of law and fact. *See Qualls v. EOG Res., Inc.*, No. CV H-18-666, 2018 WL 2317718, at *2 (S.D. Tex. May 22, 2018) (finding discretionary stay appropriate when "the nonarbitrable claims will require the resolution of issues that will be resolved during arbitration"). "That risk provides additional reason to stay this litigation." *Suzlon Infrastructure, Ltd.*, 2010 WL 3540951, at *8 (granting discretionary stay after finding significant overlap of facts and claims even though the litigation involved claims that covered a different period of time than the arbitrated claims); *see, e.g., Med–Im Dev., Inc.*, 2008 WL 901489, at *9 (granting a discretionary stay, in part, because the litigation could impact the parties' arbitration rights when the parties could seek discovery in litigation that was beyond discovery available in arbitration).

Considering the *Waste Management* factors, a discretionary stay of this case under the Court's inherent power to effectively manage its docket is warranted. *See Suzlon Infrastructure, Ltd.*, 2010 WL 3540951, at *11 ("[E]ven if the factors set out in *Waste Management* do not require a stay under section 3, those factors, on the present record, support a discretionary stay."). Accordingly, a discretionary stay of all claims in the litigation should be entered pending resolution of the arbitration

12

of Mrs. Neukranz's claims against Provident.[8]

### III.  MOTIONS TO DISMISS

Provident and Conestoga and McDermott have filed separate motions to dismiss the claims against them. (docs. 163, 165.)  Because it has been recommended that the entire action be stayed, their motions to dismiss should be denied without prejudice to refiling after the conclusion of the arbitration, if necessary.

### IV.  RECOMMENDATION

Conestoga and McDermott's motion to stay pending arbitration should be **GRANTED**, and a discretionary stay should be entered that stays all further proceedings in this case pending resolution of the arbitration of Mrs. Neukranz's claims against Provident.  Provident's and Conestoga and McDermott's motions to dismiss should be **DENIED without prejudice** to refiling, if necessary, at a later date.

**SO RECOMMENDED** this 14th day of December, 2021.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[8] As discussed, 49 plaintiffs with Provident IRAs appear to be pursing similar breach of fiduciary duty claims against Provident in arbitration, but the details of those arbitrations have not been provided. (*See* doc. 182 at 2-3.)

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

      A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE