**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DEE NEUKRANZ, et al.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:19-CV-1681-L** |
| | § | **(Consolidated with 3:21-CV-568-L)** |
| **CONESTOGA SETTLEMENT** | § | |
| **SERVICES, LLC, et al.,** | § | |
| **Defendants.** | § | **Referred to U.S. Magistrate Judge**[1] |

**<u>FINDINGS, CONCLUSIONS, AND RECOMMENDATION</u>**

Based on the relevant filings and applicable law, *Defendant Provident Trust Group, LLC's Motion to Dismiss Second Amended and Consolidated Complaint and Brief in Support*, filed May 9, 2022 (doc. 204), should be **GRANTED**.

## I.   BACKGROUND

A nationwide class of investors (Plaintiffs) with fractional interests in certain life settlement contracts sues Conestoga Settlement Services, LLC (CSS), Conestoga International, LLC (CILLC), Conestoga Trust Services, LLC (CTS) (collectively Conestoga); Provident Trust Group, LLC (Provident); James Settlement Services, LLC (JSS); and Michael McDermott (McDermott) (collectively Defendants). (doc. 197.) In a life settlement contract, an insured person sells his or her life insurance policy to a third party for less than its face value; the third party becomes the new beneficiary and has the right to collect the benefits payable upon the death of the insured, but it must pay policy premiums until maturity, or the policy lapses. (*Id.* at 13.)[2]

---

[1] By order filed November 1, 2019, this case was referred for full case management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions. (*See* doc. 52.)

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

A.    **Prior Venture**

In or about 2008, the two founders and managers of JSS recruited McDermott to become one of six "master licensees" at Retirement Value (RV), a newly formed company that sold investments in life settlement contracts. (*Id.* at 14.) JSS sold the life insurance policies to RV and provided critical data about the policies, including the life expectancy estimates and premium information, which was presented to potential investors. (*Id.* at 15.) Provident served as the IRA custodian for the investors who had invested retirement funds with RV. (*Id.* at 14.)

In May 2010, the State of Texas filed a petition in state court to shut down RV, and a receiver was appointed to take over its assets. (*Id.*) JSS was joined as a third-party defendant in 2011, and the State asserted direct claims (including fraud) against JSS and its founders in March 2013. (*Id.* at 15.) The State alleged that RV had "raised more than $65 million from over 800 investors through the sale of fraudulent investments in the death benefits of life insurance policies." (*Id.*) Investors, it claimed, were told that "a third party or third parties had performed analyses of the medical histories of the insureds" and that "[t]hese analyses reportedly determined the estimated longevity of the insureds," but it was never disclosed that RV received the life expectancy certificates from JSS and "not directly from [the third-party estimator]." (*Id.* at 15-16.) It also alleged that JSS used "understated life expectancies" to "inflate the price of the life insurance policies," and that JSS and its founders were "responsible for conceiving the fraudulent scheme perpetrated by" the defendants and "aided [them] in carrying out the scheme." (*Id.* at 17.)

The court-appointed received for RV later brought civil claims against several entities, including McDermott, JSS, and the two members of JSS, "for violations of the Texas Securities Act and Texas Deceptive Trade Practices Act in connection with their roles in the [RV] scheme."

(*Id.* at 18.)    McDermott agreed to settle the civil claims against him for $750,000 in September 2012, and JSS agreed to settle the claims against it for over $1 million in April 2013. (*Id.*) In February 2015, McDermott and JSS's founders "were each indicted by a grand jury in Collin County, Texas, for their roles in RV on multiple felony counts for securities fraud, theft by fraud, money laundering, and conspiracy." (*Id.*)

**B.    <u>Conestoga</u>**

Plaintiffs claim that after RV was shut down in 2010, McDermott devised a similar investment scheme "to acquire life insurance policies and then to market and sell interests in those policies to older investors", and he "formed various Conestoga entities to play different roles in marketing and servicing the investments." (*Id.* at 18-19.) CILLC or CSS acquired life settlement contracts to be held in trust (Conestoga Trust), and then marketed and sold fractional interests in those contracts to investors nationwide. (*Id.* at 13.) "Investors who purchased life settlement interests became beneficiaries of the Conestoga Trust." (*Id.*) Sales commissions were paid to the sales representative who made the sale, as well as to each person in the representative's "upline." (*Id.* at 27.) As with RV, JSS sold the policies to Conestoga, provided the life expectancy and premium reserve data for the policies, and calculated the minimum average cost of annual premiums necessary to maintain them. (*Id.* at 43.)

Provident allegedly partnered with Conestoga and agreed "to serve as the 'escrow agent' for participants in the Conestoga investments and to provide 'back office' administrative services for Conestoga, including handling paperwork associated with the investments, preparing and maintaining the policy selection sheets for investors, and being responsible for paying all commissions to sales representatives and 'upline' agents." (*Id.* at 19.) Plaintiffs claim that based

on its prior role in RV, "Provident knew from the start about the allegations and history of McDermott and JSS with regard to the prior life settlement scam[]." (*Id.*)

Potential investors were provided with substantially similar documents about the Conestoga investments, including a Fractional Life Settlement Portfolio brochure (the Brochure), a Private Placement Memorandum (PPM), and a Policy Selection Sheet (PSS). (*Id.* at 19, 27.)

### 1.    Brochure

According to the second amended complaint, the Brochure falsely represented that Conestoga life settlements are "safe," "simple," and "predictable" investments; that "[n]o Stranger Originated Life Insurance Policies (STOLI) are offered;" that "Conestoga escrows premiums for more than six years to more than eight years for the policies offered in its portfolio;" and that the companies partnering with Conestoga were completely "independent of each other." (*Id.* at 27-29.) It also provided a "false and misleading estimate of the expected rate of return." (*Id.* at 29.)

### 2.    PPM

The PPM described the investment features, benefits, and risks inherent in purchasing fractional interests in Conestoga life settlement contracts. (*Id.* at 30; doc. 205.)[3]  It explained that the investor "will acquire certain fixed beneficial interests in a trust which owns the life insurance policies." (doc. 205 at 9.) "When the insured person dies and the affected insurer pays the policy benefit, the Participant receives the percentage of the death benefit in which such Participant holds a fixed beneficial interest." (*Id.*) Because "[t]he only variable is the date the policy matures and the affected insurer pays the policy benefit, i.e., when the insured person dies and the policy benefit

---

[3]"Although the PPM evolved over time, the various versions of the PPM each had similar misrepresentations and omissions." (doc. 197 at 30.) The copy of the PPM attached to Provident's motion to dismiss is dated January 17, 2014. (*See* doc. 205 at 4.)

is paid by the affected insurer," "[t]he important factor in pricing fractional interests in policy benefits is the life expectancy of the insured person." (*Id.* at 9-10.)

The PPM described some of the unique characteristics of the Conestoga investment:

Unlike many financial transactions, there is no "annual rate of return" on fractional interests in policy benefits. The Participant is purchasing a fixed beneficial interest in a certain percentage of the death benefits payable upon maturity of the policy (upon the death of the insured person), at a price that represents a discount from such percentage of the death benefits. The difference between the discounted price the Participant pays (plus any additional premiums the Participant may be required to pay) and the amount of death benefit the Participant ultimately receives is the potential increase in value of the Participant's participation. The primary factor in determining this potential increase in value is the date when the insured person dies and when the Participant is paid the applicable percentage of the death benefit. Just as there is no annual rate of return, there is no payout until the policy matures, which may not occur for several years after the Participant's initial purchase. For this reason, the product should not be considered as a short-term investment.

(*Id.* at 10.)

The PPM had a separate "Risks" section that disclosed the risks involved with the Conestoga investment, beginning with the following notice:

## V.   RISKS

Fractional interests in policy benefits offer an opportunity for diversification within an asset portfolio, because the risks associated with such fractional interests in policy benefits are not directly correlated with the financial markets or with other types of financial investments. There are, however, significant risk factors involved with fractional interests in policy benefits. THIS IS A HIGHLY SPECULATIVE INVESTMENT. IT IS DESIGNED FOR SOPHISTICATED INVESTORS WHO ARE ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF THEIR INVESTMENT IN THE LIFE SETTLEMENT INTEREST AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM. BEFORE ACQUIRING A LIFE SETTLEMENT INTEREST, A PROSPECTIVE INVESTOR SHOULD CAREFULLY CONSIDER THE VARIOUS RISK FACTORS AS WELL AS SUITABILITY REQUIREMENTS AND RISKS ASSOCIATED WITH THE LIFE SETTLEMENT INTEREST, AND THE VARIOUS LEGAL, TAX, FINANCIAL, REGULATORY, AND OTHER INVESTMENT RELATED ISSUES ASSOCIATED WITH AN INVESTMENT IN THE LIFE SETTLEMENT INTEREST. PROSPECTIVE INVESTORS ARE

URGED TO CONSULT THEIR OWN LEGAL, TAX, FINANCIAL, AND INVESTMENT ADVISORS REGARDING THE SUITABILITY OF THIS INVESTMENT. **As with any financial transaction, a Participant is encouraged to seek competent legal and financial advice to assist him or her in understanding this transaction, the terms and conditions of the documents the Participant is asked to sign, and any tax consequences of the Participants decision to engage in a life settlement transaction.**

(*Id.* at 24 (formatting original).)

It specifically identified some of the "significant risk factors" with the Conestoga life

settlement contracts:

### B.    Uncertainty of Life Expectancy

As detailed in Section II of this document, the primary risk factor involved in this transaction is time. The Participant will not receive any funds or distribution of any increase in value of his/her participation until the life insurance policy or policies in which the Participant owns a fixed beneficial interest have matured, meaning that the insured person has died and the life insurance company has paid the death benefit under the policy or policies. The longer the insured person lives, the more premiums need to be paid to keep the life insurance policy in force. The longer the insured person lives and the more resulting premiums that are required to keep the life insurance policy in force, the lower the amount will be of any net increase in value of the Participant's money invested. After the funds held in escrow for the payment of premiums has been depleted. Participants who own fixed beneficial percentages of the policies affected will be required to pay additional premiums to maintain the policy and to keep it in force. This will have the effect of lowering the expected net gain of the Participant.

Because no one can with certainty predict the date of death of the insured person, life expectancy predictions are only forecasts, projections, and estimates often expected longevity of an insured and are inherently uncertain, especially in small sample sizes. Inaccuracies can result from, among other things, inaccurate diagnoses or prognoses, changes in life style, habits, or an individual's ability to resist or fight disease, reliance on outdated medical information or modeling or crediting of medical conditions and information. Conestoga does not represent that it is an expert in regard to life expectancy predictions and instead, relies on predictions of others to estimate the median life expectancy of the insureds whose policies Conestoga purchases. The accuracy of any life expectancy estimates and the medical information regarding the insureds will not be independently verified by Conestoga. The actual maturity date of the policies may be longer than predicted which would negatively impact the time within which investors could expect to

receive a return of their invested funds. In addition, improvements in medicine and health services may enable some insureds to live longer than expected, Conestoga makes no guarantee or assurance that any life expectancy prediction obtained with respect to the expected length of life of an insured under a life settlement policy will be accurate or correct. Any mortality tables (which are subject to change from time to time) or other actuarial data with respect to the insured under such life settlement policy will only be predictive of, and therefore without guarantee whatsoever, of the future longevity or expected mortality of an insured under such life settlement policy.

To protect against these uncertainties, Conestoga takes an average of the life expectancy reports from two licensed and registered independent life expectancy underwriting companies, or a combination of an underwritten life expectancy report and a life expectancy issued by the United States Social Security Administration. The Social Security Life Expectancy Tables do not take into account an individual's personal health status, but are based on the actual recorded deaths for millions of Americans. Conestoga then may add an additional period of time to that average to obtain the final figure for purposes of calculating the amount of premium to escrow. These licensed and registered life expectancy companies are entirely independent and not affiliated with Conestoga or die Conestoga Settlement Trust.

## C.    Requirement to Pay Additional Premiums, Failure to Pay Premiums, Increased Premiums

By entering into a transaction with Conestoga, a Participant will own a fixed beneficial interest in the right to the future payment of a fractional interest in the death benefit payable under life insurance policy insuring the life of another person. A vitally important part of this transaction is keeping the life insurance policy in force. The insurance company which issued the life insurance policy may cancel the policy if the premiums due on such policy are not paid to keep the policy in force. If the policy is not in force at the time of the insured person s death, the life insurance company may not pay the death benefit, and the Participant's fractional interest in policy benefits will be worthless.

Conestoga, or its designee, will be responsible for servicing the policies, including directing timely payment of insurance premiums from investor funds maintained by the Escrow Agent. If a life insurance company is able to increase the cost of insurance charged for any of the policies, the amounts required to be paid for insurance premiums due for these policies may increase, requiring the Participants to incur additional costs to maintain the policies. THESE ADDITIONAL COSTS WILL ADVERSELY AFFECT THE EXPECTED GAIN ON THOSE POLICIES WHEN THEY MATURE. Failure to pay premiums on the policies when due will result in termination or "lapse" of the policies. Conestoga relies on pricing models that it believes will allow it to meet future premium costs, but there can be no guarantee that the pricing models are or will be completely accurate. A life

insurance company may, in a "lapse" situation, view a reinstatement of a policy to be the same thing as the issuance of a new policy, and could require the current owner of the policy to have an insurable interest in the life of the insured under the policy as of the date of the reinstatement. In such an event, investors would lose the entire value of their life settlement interests purchased from Conestoga. To mitigate this risk, Conestoga sets aside a portion of each investor's purchase amount ill an escrow account estimated to be sufficient to pay premiums on the policies through the averaged life expectancies of the insureds and may designate funds to pay premiums for an additional time period, but there can be no assurance that such estimate will be accurate or sufficient to pay such premiums or that Conestoga will be able to sell a sufficient amount of life settlement interests with respect to each policy to pay all of the premiums due thereunder.

At the time of a Participant's initial participation, a certain amount of the funds deposited will be placed into escrow for payment of estimated premiums to keep the life insurance policy in force. If the insured person lives longer than estimated, a Participant may be requested to pay his or her percentage share of additional premiums necessary to continue to keep the life insurance policy in force. If a Participant fails to make such payments when requested, his or her fractional interest in policy benefits may be terminated, and he/she will lose his/her position with respect to the policy benefits. Conestoga has instituted a procedure by which such Participant is given a limited amount of time to redeem his/her interest in the policy. If the Participant fails to make the required premium payments during the redemption period, the Participant's position in the policy is lost, and that fractional interest may be offered to another Participant.

***

### D.    No Direct Ownership of the Life Insurance Policy

The Conestoga Settlement Trust actually owns the life insurance policy resulting from the life settlement transaction. The Conestoga Settlement Trust has arranged for the services of an independent escrow agent, which will be responsible for: (1) maintaining the life insurance policy, (2) making necessary premium payments to the insurance company to keep the policy in force, and (3) upon the death of the insured person and receipt of the death benefits, distributing the proceeds of the death claim to the beneficiaries who held a beneficial interest in such policy, according to their percentage of participation. If you choose to participate, you will become a beneficiary of the Conestoga Settlement Trust, to the extent of your percentage of participation.

***

### Q.    Conestoga Only Uses One Source for its Life Insurance Policies

Conestoga uses one source, for life insurance policies. Conestoga is comfortable with this relationship because the policy provider is entirely independent from Conestoga and only acquires policies issued by U.S. legal reserve life insurance

8

> companies rated "A" or better by the A.M. Best Company. All policies have been in existence for a minimum of two (2) years. Prior to their acquisition, all premiums have been paid by the policies' original owners. Conestoga takes an average of two estimates of life expectancy to develop the life expectancy to be applied to a particular policy, or a combination of an underwritten life expectancy report and a life expectancy issued by the United States Social Security Administration.

(*Id.* at 25-32 (formatting original).)

The PPM also had a section about Conestoga and the other entities associated with the Conestoga investment. (*Id.* at 14-18.) It explained that "[t]he Conestoga business model utilizes multiple independent entities to maintain the integrity of the product and promote accuracy and efficiency," and that "[t]he use of independent entities, including an escrow agent, accounting firm, custodial bank, and compliance law firm, ensures that checks and balances are built into the Conestoga model." (*Id.* at 14.) It described the involvement of Provident as follows:

> Provident Trust Group, LLC is the escrow agent for Conestoga Settlement Services and Conestoga International. The relationship was established on May 14, 2010. The express purpose of the relationship is for Provident to hold funds collected for payment of life settlement acquisition costs, fees, and future life insurance policy premiums on behalf of the Conestoga Trust.

> Provident was designated by Conestoga Settlement Trust and has a Services Agreement with Conestoga which includes in part the following services to be provided:
> - Establish Systems and Procedures at directive of Trustor
> - Pay Commission to Independent Contractor Network
> - Policy Transfers - including maintaining records
> - Accounting Process
> - Accounting Review Facilitator

(*Id.* at 17.)

### 3.    PSS

The PSS is a chart of the available policies that contained key information about each policy, including amount invested, purported life expectancy, premium reserve period, payout at

maturity, and estimated annual premium cost. (doc. 197 at 21.) As reflected in the two example PSSs copied in the second amended complaint, CILLC is the only defendant listed. (*Id.* at 21-22.)[4]

## C.    <u>Provident</u>

After an investor agreed to participate in the Conestoga life settlement investment, Provident sent the investor correspondence on Provident letterhead, including a welcome letter (Welcome Letter) along with "a copy of the policy selections currently available." (*Id.* at 26.) Plaintiffs allege that the Welcome Letter provided the same life expectancy and premium data from the PSS, but it did not disclose that the data derived from JSS or that the premium costs would increase. (*Id.*) It referred to Provident as "Custodian for your Traditional IRA and Escrow Agent for Conestoga International, LLC." (*Id.*) It also instructed the investor to notify Provident within ten days if the investor wanted to reject any of the selected policies. (*Id.*)

Plaintiffs allege that Provident had "various roles in the illegal scheme," including as "back office administrator", "marketing manager", "escrow agent", and "payor of commissions." (*Id.* at 36.) As "back office administrator," Provident "assisted in implementing the Conestoga business strategy and developing the marketing materials to sell life settlement contracts to investors" and "handled virtually all of the business operations" for Conestoga. (*Id.* at 37.) Provident also "knew that JSS was the source of the policies and the data about the policies" and "often prepared the PSS for prospective investors, using the data supplied by JSS." (*Id.* at 38.) As "marketing partner," Provident "was closely involved in the creation of Conestoga's marketing materials and reviewed the marketing materials," and at least one person who worked for Conestoga believed that

---

[4]"Almost every investor received a PSS substantially similar in form, with only minor variations to the form throughout Conestoga's history." (*Id.* at 197.)

Provident "reviewed and approved the written marketing materials before they were issued." (*Id.*) It "made material misrepresentations about the investments on the [Welcome Letter], which included many of the same false statements as the PSS based on data provided by JSS." (*Id.* at 39.) As "escrow agent," Provident represented that it would hold all participant funds in escrow accounts for the benefit of investors. (*Id.* at 40.) It also "had access to the underlying insurance policy assets and knew what the premiums were forecasted to be" based on policy illustrations it received from the insurance companies, which showed expected future premiums. (*Id.* at 41.) Provident commingled investors' funds in accounts controlled by Conestoga, failed to set up proper escrow accounts, and improperly paid approximately 40% of each investor's purchase money to JSS. (*Id.*) It also failed to inform investors when it "abandoned its role as escrow agent entirely in or around 2016," or to obtain consent from investors when it transferred the participant funds to an undisclosed third party. (*Id.* at 41-42.) As "payor of commissions," Provident "was to pay all commissions to sales agents, upline agents, and McDermott out of investors' purchase money," but it "routinely paid improper commissions in undisclosed amounts to undisclosed recipients out of Plaintiffs' funds in relation to their Conestoga life settlement investments." (*Id.* at 42-43.)

Plaintiffs' second amended complaint alleges that none of the investors has made a profit on the Conestoga investments, and many investors "have lost their entire investment" and "continue to face high premium demands backed by the threat of forfeiture for no value if they fail to pay promptly." (*Id.* at 4.) They seek to recover monetary and non-monetary damages from the defendants, as well as to disgorge them "of all benefits that they received as a result of their misconduct." (*Id.* at 128.)

### 1.      *Civil Conspiracy*

Plaintiffs assert a civil conspiracy claim against all the defendants, alleging they conspired to deceive and defraud them "into purchasing fractional interests in Conestoga life settlement contracts" and did so "through the use of false and misleading representations and material omissions." (*Id.* at 119.) Provident "assisted CSS and/or CILLC in marketing the investments and distributed and approved the marketing materials" and "purported to serve as an escrow agent and paid excessive commissions out of investor money to undisclosed recipients." (*Id.* at 119-20.) It also "gave assistance and encouragement to McDermott and Conestoga after discovering the torts being perpetrated on investors, and then hid the existence of the torts from investors, by (among other things) serving as agents for Conestoga; allowing McDermott and Conestoga to trade on their names and reputations; purporting to manage and oversee the escrow accounts; purporting to audit the escrow accounts; reviewing and approving the sales and marketing materials; failing to notify Plaintiffs and other class members regarding the escalating premiums and depletion of the escrow accounts; failing to notify Plaintiffs and the other class members that Provident was no longer purporting to serve as escrow agent; and by failing to report the fraud despite having a legal duty to do so." (*Id.* at 120.)

### 2.      *Common Law Fraud, Fraud by Nondisclosure, and Federal Securities Fraud*

Plaintiffs also assert claims against all the defendants for common law fraud, fraud by non-disclosure, and Rule 10b-5 federal securities fraud, alleging that they made material misrepresentations in the PSS, PPM, Brochure, and Welcome Letter provided to them directly, or by Conestoga sales agents, including:

> (a) that the Conestoga investments were "safe," low-risk investments; (b) that the Conestoga investments did not involve any "moving parts" other than time; (c) that

the life expectancies were the product of a sound estimating methodology; (d) that the estimated annual premium amounts quoted on the PSS were a reasonable estimate of future premiums that investors might be required to pay; (e) that the life expectancies were "conservative" and similar statements to that effect; (f) that the insured persons on the policies were in poor health and/or had degenerative health conditions; (g) that Provident would serve as an "escrow agent" and hold investors' funds; and (h) that sales commissions would be limited to certain amounts and only paid to certain persons.

(*Id.* at 121.) They also "omitted, concealed, and otherwise failed to disclose material facts known to them that would have affected a reasonable investor's decision whether to invest with Conestoga," including the following material omissions:

(a) that JSS had provided all of the life expectancy, premium cost, and premium reserve information to Conestoga and Provident; (b) that JSS had previously provided similar fraudulent information in relation to prior life settlement scams, including retirement value; (c) that McDermott had been a principal of the Retirement Value scam; (d) that the annual premiums would substantially increase and far exceed the estimated annual premium quoted on the PSS; (e) that the escrow reserves would be insufficient to pay the increased premiums; (f) that the life expectancies were systematically understated and substantially less than the Social Security data indicated; (g) that the premium reserve period was substantially less than the life expectancy indicated the SSA data; (h) that investors were highly likely to incur additional premium payments; and (i) that commissions would be paid to persons other than the individual sales agents in undisclosed amounts.

(*Id.* at 122-23.) They had a duty to disclose these facts to Plaintiffs because "(a) their own statements, or statements attributable to them, were false or otherwise created misconceptions among investors that created a duty to correct; (b) they actually knew that the investors were purchasing fractional interests in the life settlements based on a false understanding of material facts; (c) they owed fiduciary duties to the investors, including the duty of candor, the duty of loyalty, and the duty to make full disclosure; and/or (d) the information needed to ascertain the truth was available to these Defendants and was not reasonably available to investors." (*Id.* at 123.) Additionally, these false and misleading statements and material omissions attributed to

13

Defendants allegedly "occurred in connection with the sale or offer to sell investments in Conestoga life settlement contracts, which are securities as defined in section 3(a)(1) of the Securities and Exchange Act and elsewhere under federal law." (*Id.* at 126.)

### 3. Breach of Fiduciary Duty

Plaintiffs also assert a breach of fiduciary duty claim against only CTS and Provident, alleging that Provident owes fiduciary duties to them "because it was entrusted to serve as the independent 'escrow agent' for investors and to hold the escrowed funds belonging to investors," and they "placed trust and confidence in Provident in relation to its service as escrow agent." (*Id.* at 125.) Provident allegedly breached its fiduciary duties by "participating in a scheme to defraud Plaintiffs and the class members, failing to disclose the fraud, making false representations, transferring funds to a third party without disclosing the transfers, failing to establish the escrow accounts as represented, failing to apprise Plaintiffs and other investors of higher-than-expected premium costs and dwindling premium reserves, commingling investor funds in accounts controlled by Conestoga and with funds belonging to other persons and/or related to other insurance policies, failing to disclose conflicts of interest, engaging in self-dealing, and paying excessive and undisclosed commissions." (*Id.*)

On March 9, 2022, Provident moved to dismiss the claims against it for failure to state a claim under Rules 9(b) and 12(b)(6). (doc. 204.) Plaintiffs responded on March 30, 2022, and Provident replied on April 13, 2022. (docs. 214, 215.)

## II.  MOTION TO DISMISS

Provident moves to dismiss all claims against it for failure to state a claim under Rule 12(b)(6). (doc. 204.)

A.    **Rule 12(b)(6) Standard**

Rule 12(b)(6) allows motions to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Under the 12(b)(6) standard, a court cannot look beyond the face of the pleadings. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *see also Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000).

Pleadings must show specific, well-pleaded facts, not mere conclusory allegations to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). The court must accept those well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker*, 75 F.3d at 196. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). Nevertheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). The alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In short, a complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (citations omitted). When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 683.

As noted, a court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. *Spivey*, 197 F.3d at 774; *Baker*, 75 F.3d at 196. When a party presents "matters outside the pleadings," a court has "complete discretion" to either accept or exclude the evidence for purposes of determining the motion. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988); *accord Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007). However, "[i]f ... matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Nevertheless, "pleadings" for purposes of a motion to dismiss include attachments to the complaint. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation omitted). Similarly, documents "attache[d] to a motion to dismiss are considered part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim[s]." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (citation omitted). Accordingly, documents falling in these categories may be properly considered without converting the motion to dismiss into a motion for summary judgment. *See Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

Here, Provident attaches a copy of the PPM to its motion to dismiss. (*See* doc. 205.) Although the PPM was not attached to the second amended complaint, it may be considered part

of the pleadings because it is referred to in Plaintiffs' complaint and central to their claims. *See Collins*, 224 F.3d at 498-99. Accordingly, it is unnecessary to treat the motion to dismiss as a summary judgment motion. *See Norris*, 500 F.3d at 461 n.9.

**B.    Fraud Claims**

Provident argues that Plaintiffs' allegations in support of their claims for common law fraud, fraud by nondisclosure, and federal securities fraud fail to meet the heightened pleading requirements under Rule 9(b). (doc. 204 at 17.)

To state a securities fraud claim under Section 10(b) and Rule 10b–5 of the Securities Exchange Act, "a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of a material fact (3) made with scienter (4) on which the plaintiffs relied (5) that proximately caused the plaintiff's injury." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citation omitted).

In Texas,[5] the elements of common law fraud are: (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation, the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the

---

[5] Provident argues that Texas law should be applied to the common law claims for purposes of its motion to dismiss because the basic elements of the claims do not materially differ by state. (doc. 204 at 16-17.) "Absent notice by the parties that another state's law should apply and that the other state's law differs from Texas law, the court will apply Texas law to the dispute and presume the sister state's laws are the same." *Thermo Fisher Sci. Inc. v. Ducharme*, No. CV M-08-9, 2008 WL 11399557, at *2 (S.D. Tex. Sept. 30, 2008). Plaintiffs appear to agree that Texas law governs the common law claims because they cite to Texas law and Fifth Circuit cases applying Texas law. *See CIMC Vehicles Grp. Co. v. Direct Trailer, LP*, No. CIV.A. H-10-709, 2012 WL 4017985, at *9 (S.D. Tex. Aug. 24, 2012), *adopted by* 2012 WL 4018200 (S.D. Tex. Sept. 12, 2012) ("By uniformly relying on Texas law, the parties agree that it applies to their controversy. Absent any indication in the record that any other law should apply, the court applies Texas law."). A party who fails to brief the laws of other states forfeits any choice of law argument. *See Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 n.2 (5th Cir. 2009) ("[B]y failing to brief any other state's law, the parties have forfeited any choice of law argument.").

intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury. *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032-33 (5th Cir. 2010) (citing *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)). "A false representation is material if a reasonable person would attach importance to and be induced to act on the information." *Id.* at 1033 (citing *Citizens Nat'l Bank v. Allen Rae Invs.*, 142 S.W.3d 459, 478-79 (Tex.App.—Fort Worth 2004, no pet.)).

"Fraud by non-disclosure, a subcategory of fraud, occurs when a party has a duty to disclose certain information and fails to disclose it." *CBE Grp., Inc. v. Lexington L. Firm*, 993 F.3d 346, 353 (5th Cir. 2021) (quoting *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019)). To state a claim for fraud by non-disclosure under Texas law, the plaintiff must allege that: "(1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury." *Bombardier*, 572 S.W.3d at 219-20. A duty to disclose arises by operation of law when: (1) there is a confidential or fiduciary relationship between the parties; (2) one party learns that his previous affirmative statement was false or misleading; (3) one party knows that the other party is relying on a concealed fact, provided that the concealing party also knows that the relying party is ignorant of the concealed fact and does not have an equal opportunity to discover the truth; or (4) one party makes a partial disclosure voluntarily and conveys a false impression. *Union Pac. Res. Group v. Rhone Poulenc, Inc.*, 247 F.3d 574, 586 (5th

Cir. 2001) (citing *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex.App.-Forth Worth 1998, pet. denied)).

"Both federal securities claims and state-law fraud claims are subject to the pleading requirements of Rule 9(b)." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008) (citations omitted). Rule 9(b) contains a heightened pleading standard and requires a plaintiff to plead the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b); *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997).[6] "Put simply, Rule 9(b) requires the who, what, when, where, and how to be laid out" with respect to a fraud claim. *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (internal quotations omitted).[7]

"When multiple defendants are alleged to have committed fraudulent acts, a party claiming fraud 'must plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant; the plaintiff is obligated to distinguish among those they sue and

---

[6]The Private Securities Litigation Reform Act (PSLRA), which governs federal securities fraud claims, "reinforces the particularity requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362-63 (5th Cir. 2004) (citing *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997)). "The PSLRA *also* requires that the complaint "with respect to *each* act or omission alleged" to be false or misleading "state with *particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)) (emphasis original).

[7]A motion to dismiss for failure to plead fraud with particularity under Rule 9(b) is treated the same as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *McCall v. Genentech, Inc.*, No. 3:10-CV-1747-B, 2011 WL 2312280, at *3 (N.D. Tex. June 9, 2011) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)).

enlighten each defendant as to his or her part in the alleged fraud.'" *Hidden Values, Inc. v. Wade*, No. 3:11-CV-1917-L, 2012 WL 1836087, at *4 (N.D. Tex. May 18, 2012) (quoting *Coates v. Heartland Wireless Comms., Inc.*, 26 F.Supp.2d 910, 915 (N.D.Tex. 1998)). General allegations that lump all defendants together without segregating "the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b)." *In re Urcarco Sec. Lit.*, 148 F.R.D. 561, 569 (N.D. Tex. 1993), *aff'd sub nom. Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994). "Rather, the fraud claim must 'identify specific statements' made by the party who allegedly made the representations." *7-Eleven Inc. v. Puerto Rico-7 Inc.*, No. 3:08-CV-00140-B, 2008 WL 4951502, at *2 (N.D. Tex. Nov. 19, 2008) (citing *Williams*, 112 F.3d at 179); *see In re Parkcentral Glob. Litig.*, 884 F. Supp.2d 464, 471 (N.D. Tex. 2012) ("It is impermissible to make general allegations that lump all defendants together; rather, the complaint must segregate the alleged wrongdoing of one from another.").

Although Rule 9(b) relaxes the particularity requirement for scienter, "simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b)." *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir.1994); *see* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). "The plaintiffs must set forth *specific facts* supporting an inference of fraud." *Id.* (emphasis in original). They may sufficiently allege intent by pointing out circumstances or facts that reasonably indicate motive to commit fraud or "conscious behavior on the part of the defendant." *Dorsey*, 540 F.3d at 339 (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 565 (5th Cir. 2002)). When the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, fraud pleadings may be based on information and belief, provided that the complaint sets forth the factual basis for such belief.

20

*See Thompson*, 125 F.3d at 903. "However, this luxury 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (citation omitted).

Here, Plaintiffs globally allege that Defendants made material misrepresentations and omissions to them "related to the marketing, sale, and service of fractional interests in the Conestoga life settlement contracts," which "were made in the PSS, PPM, Brochure, and Welcome Letter, and by Conestoga sales agents." (doc. 197 at 121, 126.) The alleged material misrepresentations include that the Conestoga investments were safe, that the life expectancies and annual premium amounts were reasonably accurate, and that Provident would serve as an escrow agent and hold investors' funds. (*Id.*) Plaintiffs also allege that Defendants "omitted, concealed, and otherwise failed to disclose material facts known to them that would have affected a reasonable investor's decision whether to invest with Conestoga," including that JSS had provided the life expectancy and premium information for the policies, that JSS had been accused of fraud with regard to similar information in a prior life settlement scheme that also involved McDermott, that premium costs on the policies were expected to increase over time and exceed amounts quoted in the PSS, that the escrow reserves would be insufficient to pay the increased premiums, and that the information on life expectancies and premium reserve period was understated based on Social Security data. (*Id.* at 122-23, 126.)

While they identify the misrepresentations and omissions made in the marketing materials, Plaintiffs do not allege who made or authorized the inclusion of those misrepresentations or omissions in the materials. As discussed, allegations that "lump all defendants together, failing to segregate the alleged wrongdoing of one from those of another," do not satisfy the requirements

21

of Rule 9(b). *USA ex rel. Barrett v. Johnson Controls, Inc.*, No. 3:01-CV-1641-M, 2003 WL 21500400, at *10 (N.D. Tex. Apr. 9, 2003); *see Ingalls v. Edgewater Priv. Equity Fund III, L.P.*, No. CIV.A. H-05-1392, 2005 WL 2647962, at *5 (S.D. Tex. Oct. 17, 2005) (explaining that Rule 9(b)'s requirement of pleading fraud with specificity "requires that 'at a minimum' for each alleged misstatement or omission, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false") (citation omitted).

In *Billitteri v. Securities America, Inc.*, No. 09-CV-1568-F, 2010 WL 6785484 (N.D. Tex. July 26, 2010), a group of investors who owned non-publicly-traded offerings in a bankrupt holding company sued multiple entities, including the brokers that sold them the offerings, for state securities law violations.   The investors alleged that the offerings were made to them through PPMs that contained materially false and misleading statements and failed to disclose material information about the investments.   The PPMs were issued by the holding company entities and disseminated by the brokers. They claimed that the brokers were connected to the fraudulent conduct of the bankrupt holding company and other defendants because the brokers "participated in the drafting, preparation, approval, due diligence and/or dissemination of various materially false and misleading statements contained in the PPMs." *Id.* at *3. The court found that although the investors had "carefully and thoroughly explain[ed] the underlying wrongful conduct" of the other parties and had identified the materially untrue statements and material omissions in the PPMs, they had "fail[ed] to state with sufficient particularity any broker defendant's role in the described fraud." *Id.* at *6. The investors had generally alleged that the brokers were involved in

the drafting of the PPMs, but "Rule 9(b) requires [them] to identify the facts underlying each [broker's] involvement in the production or drafting of the allegedly false or misleading PPMs." *Id.* at *7. To survive dismissal under Rules 9(b) and 12(b)(6), the investors had to "connect, with greater specificity, the individual [b]roker [d]efendants to their alleged involvement in the making of the allegedly materially false and misleading statements." *Id.* Because the investors failed to plead each broker's role in the alleged misconduct with sufficient specificity, the court granted the brokers' motion to dismiss and dismissed the state securities fraud claim. *Id.* at *8.[8]

As in *Billitteri*, Plaintiffs allege that Provident had various roles in creating, reviewing, and approving the marketing materials with the material misrepresentations, but they do not identify who made or decided to include the alleged misrepresentations and omissions in the marketing materials. The second amended complaint groups the defendants and alleges that they made the representations and omissions in the marketing materials provided to investors. (doc. 197 at 121-24.) It refers to the Brochure, PPM, and PSS as "Conestoga marketing materials," and Conestoga is identified on the front of the PPM and the top of the PSS. (*Id.* at 20-25, 27-35.) Although the Welcome Letter is on Provident letterhead, Plaintiffs allege that it included the same information and representations from the PSS. (*Id.* at 26.)

While Plaintiffs contend that Provident significantly assisted in preparing the marketing materials and was aware that the information concerning the life expectancy estimates and premium amounts was false and misleading, they fail to allege any facts to establish that the allegedly misleading statements in the material materials were made or authorized by Provident.

---

[8]Although this case involved violations of the Texas Securities Act, the court found that a state securities fraud claim must also satisfy the heightened pleading requirements of Rule 9(b). *See Billitteri*, 2010 WL 6785484, at *4 (citing *Dorsey*, 540 F.3d at 343-44).

*See Ogbonna v. USPLabs, LLC*, No. EP-13-CV-347-KC, 2014 WL 2592097, at *11 (W.D. Tex. June 10, 2014) (finding allegations that defendants issued press releases and other statements without identifying "which defendant made which allegedly fraudulent misrepresentation" in those publications failed to satisfy Rule 9(b)); *Setliff v. Zoccam Techs., Inc.*, No. 3:21-CV-2025-B, 2022 WL 4240893, at *16 (N.D. Tex. Sept. 13, 2022) (dismissing common law fraud and fraud by nondisclosure claims because allegations that defendants failed to disclose material information in document they published "impermissibly group[ed] [d]efendants together to impute the fraud against both"). Further, there are no allegations that Provident decided or had the authority to decide what information to include in or omit from the Conestoga marketing materials. The second amended complaint includes statements from agents who worked for Conestoga about Provident being closely involved in the review and approval of written marketing materials, but these allegations are insufficient to give rise to a reasonable inference that Provident made the misrepresentations in the marketing materials or determined what information should or should not be included in those materials. No other facts are alleged to support an inference that the material misrepresentations from statements or omissions in the marketing materials are specifically attributable to Provident.

Because Plaintiffs' allegations about misrepresentations and omissions are attributed to defendants as a group and do not give Provident fair notice of the nature of its alleged participation in the alleged fraud, they fail to sufficiently state a fraud claim with particularity against Provident. *See Billitteri*, 2010 WL 6785484, at *7-8; *Southland*, 365 F.3d at 365 (holding that plaintiffs claiming securities fraud against multiple defendants must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud") (emphasis in the

24

original); *see, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp.2d 504, 570 (S.D. Tex. 2011) (finding fraud claim failed to meet the requirement of particularity under Rule 9(b) because complaint failed to link the defendants in any specific way to any alleged fraudulent misrepresentation or omissions); *Ergonomic Lighting Sys., Inc. v. Com. Petroleum Equip./USALCO*, No. SA-02-CA-0031 RF(NN), 2003 WL 22436101, at *3 (W.D. Tex. Oct. 21, 2003) (finding allegations that defendants made affirmative misrepresentations and omitted to provide material information that did specify which defendant made which material misrepresentation or omission failed to comply with Rule 9(b) pleading requirements); *see In re Urcarco Sec. Litig.*, 148 F.R.D. at 569 (finding that plaintiff's "lumping together" of the "thirteen named defendants, three of which are supposed to represent a defendant class of fifty firms" simply as "defendants" failed to "segregate the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b)").

Even if Plaintiffs alleged facts that are sufficient to plausibly link Provident to each misrepresentation or omission in the marketing materials, they have not alleged facts supporting a strong inference that Provident acted with fraudulent intent. As noted, allegations of scienter may be averred generally, but conclusory and speculative allegations of fraudulent intent will not suffice. *See Melder*, 27 F.3d at 1102; *see also Southland*, 365 F.3d at 361 (noting that courts "will not strain to find inferences favorable to the plaintiffs" and will not accept "conclusory allegations, unwarranted deductions, or legal conclusions"). The second amended complaint lacks specific allegations to support Plaintiffs' conclusory assertion that based on Provident's prior involvement with McDermott and JSS in RV, it knew or should have known that information about estimates from JSS would be false or misleading. Although it details the involvement of McDermott and JSS

in RV, it does not contain any facts from which it can be reasonably inferred that Provident was aware of the matters alleged. (doc. 197 at 14-18.) Plaintiffs point to Provident's role as IRA custodian for RV, but they do not provide specific facts detailing its involvement in the fraudulent conduct. *See Taya Agric. Feed Mill Co. v. Byishimo*, No. CV H-21-3088, 2022 WL 103557, at *4 (S.D. Tex. Jan. 11, 2022) ("A suspicion of possible fraudulent activity by another person does not amount to actual knowledge of the specific fraud committed."); *Litson-Gruenber v. JPMorgan Chase & Co.*, Case No. 09-CV-056, 2009 WL 4884426 (N.D. Tex. Dec. 16, 2009) ("Suspicion and surmise do not constitute actual knowledge.... Plaintiff's factual narrative is, at best, merely a story of suspicious activity that Plaintiff contends should have provided Defendant notice of the [fraudulent scheme]. As such, this is not sufficient to satisfy the requirement of actual knowledge for aider and abettor liability.").

Plaintiffs allege in conclusory fashion that Provident had access to the life insurance policies and had the ability to request policy illustrations from the issuing life insurance companies, and that those documents would have shown that the life expectancy and premium estimates provided by JSS were understated and substantially less than what Social Security data indicated. (doc. 197 at 41.) These allegations are insufficient to give rise to a plausible inference that Provident possessed the requisite knowledge, as there are no facts explaining how those documents would show Provident that the information JSS provided was false and misleading. *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) ("An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." explaining that "mere publication of inaccurate accounting figures . . . does not establish scienter"); *Melder*, 27 F.3d at 1103 (finding allegations

26

that defendants knew or had access to non-public adverse information that are contrary to representations in documents published for investors failed to adequately plead scienter in support of a securities fraud claim).

Plaintiffs argue that given Provident's role as an independent escrow agent, their allegations that it "never properly established the escrow accounts and instead directed the investors' funds wherever Conestoga instructed, raises a strong inference of 'conscious behavior on the part of the defendant.'" (doc. 214 at 21 (quoting *Tuchman*, 14 F.3d at 1068).) Plaintiffs generally allege that Provident placed investors' funds in "suspense accounts" controlled by Conestoga and failed to fulfill its escrow duties, but allegations that Provident failed to adhere to professional standards or breached its contractual obligations under the escrow agreement "are inadequate, standing alone, to support an inference of fraudulent intent." *Herrmann Holdings*, 302 F.3d at 566; *see Formosa Plastics Corp. USA*, 960 S.W.2d at 48 (explaining that "the mere failure to perform a contract is not evidence of fraud"); *Melder*, 27 F.3d at 1103 ("The plaintiffs' boilerplate averments that the accountants violated particular accounting standards are not, without more, sufficient to support inferences of fraud."); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020 (5th Cir. 1996) (explaining that the mere failure to follow generally accepted accounting principles or industry custom by defendants in their publication of financial disclosures, without more, did not establish conscious behavior).

Plaintiffs have not set forth specific facts to support an inference that Provident knew that the life expectancy, premium cost, and premium reserve information was provided by JSS and was false, or that it intended to include the false information in the marketing materials to investors. More is required than simply alleging, on information and belief, that Provident made material

misrepresentations and material omissions coupled with conclusory allegations of intent. *See R2 Investments LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005) ("Knowledge of an omission does not itself necessarily raise a strong inference of scienter."); *Ingalls v. Edgewater Priv. Equity Fund III, L.P.*, No. CIV.A. H-05-1392, 2005 WL 2647962, at *3 (S.D. Tex. Oct. 17, 2005) (dismissing fraud by nondisclosure claim because complaint did not include facts tending to show that defendants either knew of alleged scheme or owed plaintiff a duty to disclose the scheme).

Because Plaintiffs have failed to meet the heightened pleading requirement of Rule 9(b), Provident's motion to dismiss their claims against it for common law fraud, fraud by nondisclosure, and securities fraud for failure to state a claim should be granted.[9]

## C.    <u>Civil Conspiracy</u>

Provident argues that Plaintiffs' civil conspiracy claim fails for the same reasons as its fraud claims. (doc. 204 at 25-27.)

Under Texas law, a civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Rodgers v. City of Lancaster Police*, No. 3:13-CV-2031-M-BH, 2017 WL 457084, at *16 (N.D. Tex. Jan. 6, 2017), *adopted by* 2017 WL 447216 (N.D. Tex. Feb. 2, 2017) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). "[I]n short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of

---

[9] Because the federal securities fraud claim is subject to dismissal under Rule 9(b), it is not necessary to reach Provident's argument that Plaintiffs fail to establish that the investments are securities. (*See* doc. 204 at 23.)

the conspiracy." *I Love Omni, LLC v. Omnitrition Int'l, Inc.*, No. 3:16-CV-2410-G, 2017 WL 1281130, at *3 (N.D. Tex. Apr. 6, 2017) (quoting *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968)). "[A] defendant's liability for conspiracy depends on [his or her] participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Additionally, it requires a specific intent. *I Love Omni*, 2017 WL 1281130, at *3.

Here, Plaintiffs allege that Provident conspired with the other defendants to deceive and defraud them into purchasing interests in Conestoga life settlement contracts, and that it did so through false and misleading representations and material omissions. (*See* doc. 197 at 119-20.) As discussed, they have failed to allege sufficient facts to nudge any of their fraud claims against Provident across the line from conceivable to plausible. *See Twombly*, 550 U.S. at 555. Without some underlying unlawful or tortious act, they cannot hold Provident liable for civil conspiracy. *See Tilton*, 925 S.W.2d at 681; *Askanase v. Fatjo*, 130 F.3d 657, 676 (5th Cir. 1997) (holding that "because the fraud claim fails[,] the fraud based conspiracy claim must fail also"). Plaintiffs' speculative and conclusory allegations regarding Provident's past involvement with the other defendants in RV do not plausibly show a "preconceived plan" to commit fraud or to do anything in furtherance of committing fraud. *Samsung Elecs. Am., Inc.*, 2017 WL 635031, at *13.

Because Plaintiffs have failed to plead sufficient allegations to support the elements of their civil conspiracy claim against Provident, they fail to state a claim. *See Askanase v. Fatjo*, 130 F.3d at 676; *Mathis v. DCR Mortg. III Sub, I, LLC*, 952 F.Supp.2d 828, 836 (W.D. Tex. 2013) (finding plaintiff's civil conspiracy claim was predicated primarily on his fraud claims, and it failed

29

alongside those claims).[10]  Provident's motion to dismiss this claim should be granted.

**D.**    **Breach of Fiduciary Duty**

Provident argues that the breach of fiduciary duty claim should be dismissed because it "never owed [Plaintiffs] any fiduciary duty, formal or informal," and any claim based on its role as escrow agent belongs to the Conestoga Trust. (doc. 204 at 27-29.)

Under Texas law, the essential elements of a breach of fiduciary duty claim are "(1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 581 (5th Cir. 2015) (quoting *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.)). Whether a party owes a fiduciary duty is a question of law. *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005). Courts impose fiduciary duties on parties based on the special nature of the relationships between such parties. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002). A fiduciary duty arises from certain formal relationships as a matter of law, such as an attorney-client or trustee relationship. *Id.* Courts also recognize an informal fiduciary duty that arises from "a moral, social, domestic or purely personal relationship of trust and confidence." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998). "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit*." Jacked Up, L.L.C.*

---

[10]A fiduciary duty claim is also asserted against Provident, but the parties do not address whether it provides a separate underlying unlawful or tortious act for the civil conspiracy claim. Because the fiduciary duty claim should be dismissed for the reasons that follow, even assuming that the second amended complaint sufficiently alleged civil conspiracy based on the fiduciary duty claim, the conspiracy claim still fails as a matter of law.

*v. Sara Lee Corp.*, 854 F.3d 797, 809 (5th Cir. 2017) (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998)).

In Texas, "[t]he escrow relationship is a stakeholder relationship that carries special duties, including those of a fiduciary nature." *Trahan v. Lone Star Title Co. of El Paso, Inc.*, 247 S.W.3d 269, 287 (Tex. App.—El Paso 2007, pet. denied). "[A]n escrow is created only when the parties come to a clear and definite agreement directing that the funds be deposited with a third party and specifying the terms and conditions on which the third party is required to deliver the funds." *Affiliated Comput. Sys., Inc. v. Sherman (In re Kemp)*, 52 F.3d 546, 551 (5th Cir. 1995). The escrow agent "is appointed through a specific written instrument which imparts a legal obligation," more commonly known as the escrow agreement. *Chapman Children's Trust v. Porter Hedges, L.L.P.*, 32 S.W.3d 429, 438 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

Generally, an escrow agent owes fiduciary duties only to the parties to the escrow agreement, including "(1) the duty of loyalty, (2) the duty to make full disclosure, and (3) the duty to exercise a high degree of care to conserve the money and pay only those entitled to receive it." *Flagstar Bank, FSB v. Walker*, 451 S.W.3d 490, 499 (Tex. App.—Dallas 2014, no pet.). "While these are the general duties of an escrow agent arising as a matter of law, these duties are limited to the escrow agent's role as escrow agent and defined by the escrow agreement itself." *Bates Energy Oil & Gas, LLC v. Complete Oil Field Servs., LLC*, No. SA-17-CA-808-XR, 2017 WL 4051569, at *6 (W.D. Tex. Sept. 13, 2017) (citing *Garcia v. Bank of Am. Corp.*, 375 S.W.3d 322, 333 (Tex. App.–Houston [14th Dist.] 2012, no pet.). As a general rule, an escrow agent does not owe a fiduciary duty to third parties who are not parties to the escrow agreement. *See Gary E. Patterson & Assoc., P.C. v. Holub*, 264 S.W.3d 180, 203 (Tex. App.-Houston [1st Dist.] 2008, pet.

denied). The Texas Supreme Court has held that even in the absence of a formal escrow agreement, the fiduciary duties of an escrow agent can be imposed on the holder of funds when the circumstances strongly resemble an escrow arrangement. *City of Fort Worth v. Pippen*, 439 S.W.2d 660, 664-65 (Tex. 1969) (holding that agent who accepted money from principal to accomplish a specific purpose owed principal the fiduciary obligations of an escrow agent).

Here, the second amended complaint alleges that "investors purchased fractional interests in several policies and became beneficiaries of the Conestoga Trust which holds the policies," and that a portion of each investor's "purchase money for each policy was to be set aside in escrow to pay the investor's share of premiums due for the life expectancy of the insured person, plus a cushion period of at least 12 months on each policy." (doc. 197 at 2.) It alleges that the marketing materials represented that "Provident would serve as the 'escrow agent' and would hold all participant funds" for the benefit of investors. (*Id.* at 40.) According to the PPM, funds placed by the investors would be held by Provident, "an escrow agent that is completely independent from any Conestoga entity." (doc. 205 at 7.) The PPM states that Provident "is the escrow agent for [CSS and CILLC]," and that "[t]he express purpose of the relationship is for Provident to hold funds collected for payment of life settlement acquisition costs, fees, and future life insurance policy premiums on behalf of the Conestoga Trust." (*Id.* at 17.) "Provident was designated by Conestoga Settlement Trust and has a Services Agreement with Conestoga" to provide in part the following services: establish systems and procedures at the directive of trustor, pay commissions, handle policy transfers, maintain records, handle the accounting process, and facilitate accounting review. (*Id.*) Even though the escrow agreement is not provided, and the terms of the agreement are unknown, it is undisputed that Plaintiffs are not a party to that agreement.

Plaintiffs allege that Provident owes fiduciary duties to them "because it was entrusted to serve as the independent 'escrow agent' for investors and to hold the escrowed funds belonging to investors," and that they "placed trust and confidence in Provident in relation to its service as escrow agent." (doc. 197 at 125.) As explained, an escrow agent's fiduciary duties are strictly limited to the parties to the escrow agreement. *Gary E. Patterson*, 264 S.W.3d 180, 203 (Tex. App.— Houston [1st Dist.] 2008, pet. denied). "Because an escrow agent's fiduciary duty only extends to parties to the escrow contract, there is no duty . . . to a non-party . . . to the escrow agreement." *In re Lopez*, No. 16-70134, 2019 WL 3987748, at *3 (Bankr. S.D. Tex. Aug. 22, 2019) (citing *id.*).

A fiduciary duty claim asserted under similar circumstances was recently dismissed in *Lin v. Veritex Cmty. Bank, N.A.*, No. CV H-20-1904, 2021 WL 3831986 (S.D. Tex. Jan. 4, 2021). The plaintiff, a foreign national, had invested $500,000 in an entity established for foreign investment in businesses in the United States. The entity had an escrow agreement with the escrow agent that provided for the distribution and management of investor funds; although investors were not a party to the agreement, they received certain benefits under it. The plaintiff sued the escrow agent for breach of contract and breach of fiduciary duty, alleging it had wrongfully released his funds in violation of the escrow agreement. The court found that the plaintiff was a third-party beneficiary of the escrow agreement and had standing to sue for breach of contract. It dismissed his claim for breach of fiduciary duty, however, because "[u]nder Texas law, an escrow agent under a written escrow agreement owes a fiduciary duty to both parties to the escrow agreement, but does not owe a fiduciary duty to a non-party", despite the fact that the plaintiff had provided the funds and was identified as the intended beneficiary under the agreement. *Id.* at *4 (citing *Gary*

*E. Patterson*, 264 S.W.3d at 203).

As in *Lin*, Plaintiffs provided the funds held by the escrow agent but are not parties to the escrow agreement for the investment venture. Even if they obtained certain benefits under the escrow agreement, Provident does not owe them direct duties because they are not parties to it. *See Rove v. First Am. Title Ins. Co.*, No. 05-96-01783-CV, 1998 WL 696880, at *4 (Tex. App.—Dallas Oct. 8, 1998, no pet.) (finding no fiduciary duty owed to nonparty to escrow agreement who had provided the earnest money for the underlying transaction pursuant to a separate agreement); *Lee v. TriCentury Corp.*, No. 1:08-CV-719, 2010 WL 11527433, at *7-8 (E.D. Tex. Aug. 20, 2010) (rejecting argument that escrow agent owed investors a general fiduciary duty of full disclosure when the escrow agreement limited the agent's role to holding funds until certain requirements were fulfilled). While Plaintiffs allegedly placed "trust and confidence" in Provident's role as escrow agent, "[m]ere subjective trust does not ... transform arm's-length dealing into a fiduciary relationship." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (citation omitted).

Plaintiffs argue that they are not asserting "derivative" fiduciary duty claims based on the duties owed to the parties under the escrow agreement, but on the direct fiduciary duties that Provident owed them "as the escrow agent holding their money." (doc. 214 at 12.) They contend that Provident "gave the appearance of being a safeguard for investors," and they point to the PPM and other marketing materials that represented it as being an independent escrow agent and a "check and balance" for the benefit of investors. (*Id.* at 12.) They argue that they "have adequately pled the existence of a fiduciary relationship based on the fact that Provident held their funds for a specific purpose." (*Id.* at 14.)

In *Newington Ltd. v. Forrester*, No. 3:08-CV-0864-G, 2008 WL 4908200, at *3 (N.D. Tex.

Nov. 13, 2008), cited by Plaintiffs, an investor interested in purchasing shares in a company agreed to make a "good faith" deposit, which would be held in a trust account controlled by the company's attorney during negotiations. Even though the investor instructed the attorney to hold the funds until the deal was finalized, the attorney immediately sent part of the funds to a third-party creditor. When the attorney was unable to return the full deposit after negotiations broke down, the investor sued him, in relevant part, for breach of fiduciary duty. Noting that the fiduciary duties of an escrow agent in Texas will be imposed on the holder of funds without an escrow contract "when the situation closely parallels an escrow arrangement," the court held that the attorney owed the investor the duties of an escrow agent despite the lack of an escrow agreement because he had received money from him "accompanied by specific instructions on how to apply it." *Id.* at *3 (citing *Pippen*, 439 S.W.2d at 662). "Texas courts have held that this type of arrangement requires the fund-holder to act as an escrow agent and to comply with the duties inherent in that role." *Id.* (citing *Pippen*, 439 S.W.2d at 665).

Unlike *Newington*, it is undisputed in this case that certain Conestoga entities had an escrow agreement with Provident, and that the escrow duties defined by that agreement applied to Plaintiffs' funds held and received by Provident. *See Luppino v. York*, No. SA-16-CV-00409-RCL, 2017 WL 4415661, at *3 (W.D. Tex. Sept. 29, 2017) (explaining that "the fiduciary duties enumerated in *Pippen* . . . cannot be assumed to apply to a true escrow governed by an escrow agreement"); *Dipprey v. Double Diamond, Inc.*, 637 S.W.3d 784, 803 (Tex. App.—Eastland 2021, no pet.) (rejecting argument that party designated under formal escrow contract also owed fiduciary duty to nonparties because it controlled and managed their funds and was tasked with disbursing those funds for their benefit). Plaintiffs argue that Provident owed them direct fiduciary

duties and not "derivative duties as 'Conestoga's escrow agent,'" but the conduct that they allege constitutes a breach of the fiduciary obligations owed to them is based on Provident's duties under the formal escrow agreement between it and the Conestoga entities.

In addition, the fiduciary duty claim in *Newington* was directly tied to the circumstances of the escrow arrangement: the attorney received money from the investor with specific instructions on its use, and he allegedly breached duties imposed under that escrow arrangement when he paid funds in violation of those instructions. *See* 2008 WL 4908200, at *3. Here, Plaintiffs provided funds to acquire beneficial interests in the Conestoga Trust, and Provident was designated as the escrow agent under an escrow agreement between it and the Conestoga entities with directions on the use and management of those funds. Plaintiffs argue that they assert direct fiduciary duty claims against Provident "based on the facts that Provident received and held the Plaintiffs' funds and were responsible for using those funds to pay the Plaintiffs' share of premiums owed and remitting back to the Plaintiffs their share of the proceeds of any maturities." (doc. 214 at 13.) Even though Plaintiffs were the source of the funds placed with Provident, they do not allege that they provided additional instructions to Provident on the use of those funds, or that the funds were provided for a specific purpose separate from the escrow agreement. Texas courts "have rejected the argument that transferring funds into a party's account, without more, creates an escrow agreement and its associated fiduciary duties." *Olmos v. David B. Giles P.C.*, No. 3:22-CV-0077-D, 2022 WL 1289556, at *4 (N.D. Tex. Apr. 28, 2022) (citing cases); *see Bank One Texas, N.A. v. Taylor*, 970 F.2d 16, 24 (5th Cir. 1992) ("[T]he law is clear that a mere deposit of earnest money into a bank account is not sufficient to create an escrow contract or create escrow liabilities."). While Plaintiffs maintain that their fiduciary claim is not derivative of the escrow

36

duties owed to the Conestoga Trust under the escrow agreement, their fiduciary duty claims are based on escrow duties owed under that escrow relationship, not on the independent duties imposed on the holder of funds in a situation that "closely parallels an escrow arrangement" as in *Pippen* and *Newington*.

Because Plaintiffs have not pled facts that make the existence of a fiduciary relationship between them and Provident plausible, their breach of fiduciary duty claim against it should be dismissed.

### III. REQUEST FOR LEAVE TO AMEND

In the conclusion section of their response, Plaintiffs state that "if the Court considers the motion to have merit, [they] respectfully request leave to amend their pleading." (doc. 214 at 29.) They do not identify any additional facts that they seek to include in a third amended complaint, and they also fail to attach a proposed amended pleading as an exhibit. Their request does not comply with Local Rule 15.1 of the Local Civil Rules for the Northern District of Texas, which provides that when a party files a motion for leave to file an amended pleading, the party must attach the proposed amended pleading as an exhibit. Compliance with the rules of procedure is required of all parties; leave to amend may be denied for non-compliance. *Shabazz v. Franklin*, 380 F. Supp.2d 793, 798 (N.D. Tex. 2005). Plaintiffs' request is **DENIED** without prejudice to filing a motion that complies with the applicable rules of civil procedure and the local rules.

### IV. RECOMMENDATION

Provident's motion to dismiss for failure to state a claim should be **GRANTED**, and the claims against it should be **DISMISSED with prejudice**.

**SO RECOMMENDED** on this 14th day of November, 2022.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE