IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DEE NEUKRANZ, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-1681-L |
| | § | (Consolidated with 3:21-CV-568-L) |
| CONESTOGA SETTLEMENT | § | |
| SERVICES, LLC, et al., | § | |
|     Defendants. | § | Referred to U.S. Magistrate Judge[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Based on the relevant filings and applicable law, *Defendants Conestoga Settlement Services, LLC[;] Conestoga International, LLC; Conestoga Trust Services, LLC; and Michael McDermott's Motion to Dismiss Plaintiffs' Second Amended and Consolidated Complaint*, filed March 10, 2022 (doc. 208), should be **GRANTED in part** and **DENIED in part**, and *Defendant Provident Trust Group, LLC's Motion to Clarify Order and Enforce Automatic Stay of Discovery under 15 U.S.C. § 78u-4(b)(3)(B)*, filed April 20, 2022 (doc. 219), *Defendants Conestoga Settlement Services, LLC[;] Conestoga International, LLC; Conestoga Trust Services, LLC; and Michael McDermott's Motion to Stay During Pendency of Motions to Dismiss and Joinder in Defendant Provident Trust Group, LLC's Motion to Clarify Order and Enforce Automatic Stay of Discovery under* 15 U.S.C. § 78u-4(b)(3)(B), filed May 10, 2022 (doc. 221), and *Plaintiffs' Motion for Particularized Discovery*, filed May 11, 2022 (doc. 223), are **DENIED as moot**.

## I.    BACKGROUND

A nationwide class of investors (Plaintiffs) with fractional interests in certain life

---

[1] By order filed November 1, 2019, this case was referred for full case management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions. (*See* doc. 52.)

settlement contracts sues Conestoga Settlement Services, LLC (CSS), Conestoga International, LLC (CILLC), Conestoga Trust Services, LLC (CTS); Provident Trust Group, LLC (Provident); James Settlement Services, LLC (JSS); and Michael McDermott (McDermott). (doc. 197.)

## A.    __Prior Venture__

In or about 2008, the two founders and managers of JSS recruited McDermott to become one of six "master licensees" at Retirement Value (RV), a newly formed company that sold investments in life settlement contracts.[2] (*Id.* at 14.)[3] JSS sold the life insurance policies to RV and provided critical data about the policies, including the life expectancy estimates and premium information, that was presented to potential investors. (*Id.* at 15.) Provident served as the IRA custodian for the investors who had invested retirement funds with RV. (*Id.* at 14.)

In May 2010, the State of Texas filed a petition in state court to shut down RV, and a receiver was appointed to take over its assets. (*Id.*) JSS was joined as a third-party defendant in 2011, and the State asserted direct claims (including fraud) against JSS and its founders in March 2013. (*Id.* at 15.) The State alleged that RV had "raised more than $65 million from over 800 investors through the sale of fraudulent investments in the death benefits of life insurance policies." (*Id.*) Investors, it claimed, were told that "a third party or third parties had performed analyses of the medical histories of the insureds" and that "[t]hese analyses reportedly determined the estimated longevity of the insureds," but it was never disclosed that RV received the life expectancy certificates from JSS and "not directly from [the third-party estimator]." (*Id.* at 15-16.)

---

[2]In a life settlement contract, an insured person sells his or her life insurance policy to a third party for less than its face value; the third party becomes the new beneficiary and has the right to collect the benefits payable upon the death of the insured, but it must pay policy premiums until maturity, or the policy lapses. (*Id.* at 13.)

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

It also alleged that JSS used "understated life expectancies" to "inflate the price of the life insurance policies," and that JSS and its founders were "responsible for conceiving the fraudulent scheme perpetrated by" the defendants and "aided [them] in carrying out the scheme." (*Id.* at 17.)

The court-appointed receiver for RV later brought civil claims against several entities, including McDermott, JSS, and the two members of JSS, "for violations of the Texas Securities Act and Texas Deceptive Trade Practices Act in connection with their roles in the [RV] scheme." (*Id.* at 18.) McDermott agreed to settle the civil claims against him for $750,000 in September 2012, and JSS agreed to settle the claims against it for over $1 million in April 2013. (*Id.*) In February 2015, McDermott and JSS's founders "were each indicted by a grand jury in Collin County, Texas, for their roles in RV on multiple felony counts for securities fraud, theft by fraud, money laundering, and conspiracy." (*Id.*)

**B.    Conestoga**

Plaintiffs claim that after RV was shut down in 2010, McDermott devised a similar investment scheme "to acquire life insurance policies and then to market and sell interests in those policies to older investors", and he "formed various Conestoga entities to play different roles in marketing and servicing the investments." (*Id.* at 18-19.) He is the named founder and sole manager of CSS, a Delaware limited liability company, and CILLC, a Puerto Rico limited liability company, and has maintained control of both entities. (*Id.* at 20.) CILLC was formed to market and sell the interests in life settlement contracts to investors, while CSS was formed to be "the organizing entity and initial trustor for the Conestoga Trust." (*Id.*) McDermott was principally involved in establishing the Conestoga Trust, a Delaware statutory trust, and in how it conducted business. (*Id.* at 19-20.) CTS, a Delaware limited liability company with a non-party as its sole

member, is the trustee of Conestoga Trust. (*Id.* at 11-12, 20.)

Provident allegedly partnered with CSS, CILLC, and CTS (collectively Conestoga)[4] and agreed "to serve as the 'escrow agent' for participants in the Conestoga investments and to provide 'back office' administrative services for Conestoga, including handling paperwork associated with the investments, preparing and maintaining the policy selection sheets for investors, and being responsible for paying all commissions to sales representatives and 'upline' agents." (*Id.* at 19.) As with RV, JSS sold the underlying life insurance policies to Conestoga, provided the life expectancy and premium reserve data for the policies, and calculated the minimum average cost of annual premiums necessary to maintain them. (*Id.* at 43.) After acquiring the life settlement contracts from JSS and placing them in the Conestoga Trust, Conestoga marketed and sold fractional interests in those contracts to investors nationwide "through a multilevel marketing organization." (*Id.* at 13.) "Investors who purchased life settlement interests became beneficiaries of the Conestoga Trust." (*Id.*) Sales commissions were paid to the sales representative who made the sale, as well to each person in the representative's "upline." (*Id.* at 27.)

Potential investors were provided with substantially similar documents about the Conestoga investments, including a Fractional Life Settlement Portfolio brochure (the Brochure), a Private Placement Memorandum (PPM), and a Policy Selection Sheet (PSS). (*Id.* at 19, 27.) After an investor agreed to participate in the Conestoga life settlement investment, Provident sent the investor correspondence on Provident letterhead, including a welcome letter (Welcome Letter) along with "a copy of the policy selections currently available." (*Id.* at 26.)

---

[4] The second amended complaint lumps CSS, CILLC, and CTS together and refers to all three entities as "Conestoga." (*Id.* at 1.)

### 1.    *Brochure*

According to the second amended complaint, the Brochure falsely represented that Conestoga life settlements are "safe," "simple," and "predictable" investments; that "[n]o Stranger Originated Life Insurance Policies (STOLI) are offered;" that "Conestoga escrows premiums for more than six years to more than eight years for the policies offered in its portfolio;" and that the companies partnering with Conestoga were completely "independent of each other." (*Id.* at 27-29.) It also provided a "false and misleading estimate of the expected rate of return." (*Id.* at 29.)

### 2.    *PPM*

The PPM described the investment features, benefits, and risks inherent in purchasing fractional interests in Conestoga life settlement contracts. (*Id.* at 30.)[5]  It explained that the investor "will acquire certain fixed beneficial interests in a trust which owns the life insurance policies." (doc. 209 at 129.) "When the insured person dies and the affected insurer pays the policy benefit, the Participant receives the percentage of the death benefit in which such Participant holds a fixed beneficial interest." (*Id.*) Because "[t]he only variable is the date the policy matures and the affected insurer pays the policy benefit, i.e., when the insured person dies and the policy benefit is paid by the affected insurer," "[t]he important factor in pricing fractional interests in policy benefits is the life expectancy of the insured person." (*Id.* at 129-30.)

The PPM described some of the unique characteristics of the Conestoga investment:

> Unlike many financial transactions, there is no "annual rate of return" on fractional interests in policy benefits. The Participant is purchasing a fixed beneficial interest in a certain percentage of the death benefits payable upon maturity of the policy

---

[5]"Although the PPM evolved over time, the various versions of the PPM each had similar misrepresentations and omissions." (doc. 197 at 30.) Defendants have attached a copy of each PPM version to their motion to dismiss. (*See* doc. 209 at 47-114; 124-91.) Unless otherwise stated, all excerpts and statements referenced are from the PPM dated January 17, 2014. (*Id.* at 124-55.)

(upon the death of the insured person), at a price that represents a discount from such percentage of the death benefits. The difference between the discounted price the Participant pays (plus any additional premiums the Participant may be required to pay) and the amount of death benefit the Participant ultimately receives is the potential increase in value of the Participant's participation. The primary factor in determining this potential increase in value is the date when the insured person dies and when the Participant is paid the applicable percentage of the death benefit. Just as there is no annual rate of return, there is no payout until the policy matures, which may not occur for several years after the Participant's initial purchase. For this reason, the product should not be considered as a short-term investment.

(*Id.* at 130.)

The PPM had a separate "Risks" section that disclosed the risks involved with the

Conestoga investment, beginning with the following notice:

## V.   RISKS

Fractional interests in policy benefits offer an opportunity for diversification within an asset portfolio, because the risks associated with such fractional interests in policy benefits are not directly correlated with the financial markets or with other types of financial investments. There are, however, significant risk factors involved with fractional interests in policy benefits. THIS IS A HIGHLY SPECULATIVE INVESTMENT. IT IS DESIGNED FOR SOPHISTICATED INVESTORS WHO ARE ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF THEIR INVESTMENT IN THE LIFE SETTLEMENT INTEREST AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM. BEFORE ACQUIRING A LIFE SETTLEMENT INTEREST, A PROSPECTIVE INVESTOR SHOULD CAREFULLY CONSIDER THE VARIOUS RISK FACTORS AS WELL AS SUITABILITY REQUIREMENTS AND RISKS ASSOCIATED WITH THE LIFE SETTLEMENT INTEREST, AND THE VARIOUS LEGAL, TAX, FINANCIAL, REGULATORY, AND OTHER INVESTMENT RELATED ISSUES ASSOCIATED WITH AN INVESTMENT IN THE LIFE SETTLEMENT INTEREST. PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR OWN LEGAL, TAX, FINANCIAL, AND INVESTMENT ADVISORS REGARDING THE SUITABILITY OF THIS INVESTMENT. **As with any financial transaction, a Participant is encouraged to seek competent legal and financial advice to assist him or her in understanding this transaction, the terms and conditions of the documents the Participant is asked to sign, and any tax consequences of the Participants decision to engage in a life settlement transaction.**

(*Id.* at 144 (formatting original).)

It specifically identified some of the "significant risk factors" with the Conestoga life settlement contracts:

**B.    Uncertainty of Life Expectancy**

As detailed in Section II of this document, the primary risk factor involved in this transaction is time. The Participant will not receive any funds or distribution of any increase in value of his/her participation until the life insurance policy or policies in which the Participant owns a fixed beneficial interest have matured, meaning that the insured person has died and the life insurance company has paid the death benefit under the policy or policies. The longer the insured person lives, the more premiums need to be paid to keep the life insurance policy in force. The longer the insured person lives and the more resulting premiums that are required to keep the life insurance policy in force, the lower the amount will be of any net increase in value of the Participant's money invested. After the funds held in escrow for the payment of premiums has been depleted. Participants who own fixed beneficial percentages of the policies affected will be required to pay additional premiums to maintain the policy and to keep it in force. This will have the effect of lowering the expected net gain of the Participant.

Because no one can with certainty predict the date of death of the insured person, life expectancy predictions are only forecasts, projections, and estimates often expected longevity of an insured and are inherently uncertain, especially in small sample sizes. Inaccuracies can result from, among other things, inaccurate diagnoses or prognoses, changes in life style, habits, or an individual's ability to resist or fight disease, reliance on outdated medical information or modeling or crediting of medical conditions and information. Conestoga does not represent that it is an expert in regard to life expectancy predictions and instead, relies on predictions of others to estimate the median life expectancy of the insureds whose policies Conestoga purchases. The accuracy of any life expectancy estimates and the medical information regarding the insureds will not be independently verified by Conestoga. The actual maturity date of the policies may be longer than predicted which would negatively impact the time within which investors could expect to receive a return of their invested funds. In addition, improvements in medicine and health services may enable some insureds to live longer than expected, Conestoga makes no guarantee or assurance that any life expectancy prediction obtained with respect to the expected length of life of an insured under a life settlement policy will be accurate or correct. Any mortality tables (which are subject to change from time to time) or other actuarial data with respect to the insured under such life settlement policy will only be predictive of, and therefore without guarantee whatsoever, of the future longevity or expected mortality of an insured under such life settlement policy.

To protect against these uncertainties, Conestoga takes an average of the life

expectancy reports from two licensed and registered independent life expectancy underwriting companies, or a combination of an underwritten life expectancy report and a life expectancy issued by the United States Social Security Administration. The Social Security Life Expectancy Tables do not take into account an individual's personal health status, but are based on the actual recorded deaths for millions of Americans. Conestoga then may add an additional period of time to that average to obtain the final figure for purposes of calculating the amount of premium to escrow. These licensed and registered life expectancy companies are entirely independent and not affiliated with Conestoga or die Conestoga Settlement Trust.

## C.    Requirement to Pay Additional Premiums, Failure to Pay Premiums, Increased Premiums

By entering into a transaction with Conestoga, a Participant will own a fixed beneficial interest in the right to the future payment of a fractional interest in the death benefit payable under life insurance policy insuring the life of another person. A vitally important part of this transaction is keeping the life insurance policy in force. The insurance company which issued the life insurance policy may cancel the policy if the premiums due on such policy are not paid to keep the policy in force. If the policy is not in force at the time of the insured person s death, the life insurance company may not pay the death benefit, and the Participant's fractional interest in policy benefits will be worthless.

Conestoga, or its designee, will be responsible for servicing the policies, including directing timely payment of insurance premiums from investor funds maintained by the Escrow Agent. If a life insurance company is able to increase the cost of insurance charged for any of the policies, the amounts required to be paid for insurance premiums due for these policies may increase, requiring the Participants to incur additional costs to maintain the policies. THESE ADDITIONAL COSTS WILL ADVERSELY AFFECT THE EXPECTED GAIN ON THOSE POLICIES WHEN THEY MATURE. Failure to pay premiums on the policies when due will result in termination or "lapse" of the policies. Conestoga relies on pricing models that it believes will allow it to meet future premium costs, but there can be no guarantee that the pricing models are or will be completely accurate. A life insurance company may, in a "lapse" situation, view a reinstatement of a policy to be the same thing as the issuance of a new policy, and could require the current owner of the policy to have an insurable interest in the life of the insured under the policy as of the date of the reinstatement. In such an event, investors would lose the entire value of their life settlement interests purchased from Conestoga. To mitigate this risk, Conestoga sets aside a portion of each investor's purchase amount ill an escrow account estimated to be sufficient to pay premiums on the policies through the averaged life expectancies of the insureds and may designate funds to pay premiums for an additional time period, but there can be no assurance that such estimate will be accurate or sufficient to pay such premiums or that Conestoga will be able to sell a sufficient amount of life settlement interests with respect to each

policy to pay all of the premiums due thereunder.

At the time of a Participant's initial participation, a certain amount of the funds deposited will be placed into escrow for payment of estimated premiums to keep the life insurance policy in force. If the insured person lives longer than estimated, a Participant may be requested to pay his or her percentage share of additional premiums necessary to continue to keep the life insurance policy in force. If a Participant fails to make such payments when requested, his or her fractional interest in policy benefits may be terminated, and he/she will lose his/her position with respect to the policy benefits. Conestoga has instituted a procedure by which such Participant is given a limited amount of time to redeem his/her interest in the policy. If the Participant fails to make the required premium payments during the redemption period, the Participant's position in the policy is lost, and that fractional interest may be offered to another Participant.
***

**D.    No Direct Ownership of the Life Insurance Policy**
The Conestoga Settlement Trust actually owns the life insurance policy resulting from the life settlement transaction. The Conestoga Settlement Trust has arranged for the services of an independent escrow agent, which will be responsible for: (1) maintaining the life insurance policy, (2) making necessary premium payments to the insurance company to keep the policy in force, and (3) upon the death of the insured person and receipt of the death benefits, distributing the proceeds of the death claim to the beneficiaries who held a beneficial interest in such policy, according to their percentage of participation. If you choose to participate, you will become a beneficiary of the Conestoga Settlement Trust, to the extent of your percentage of participation.
***

**Q.    Conestoga Only Uses One Source for its Life Insurance Policies**
Conestoga uses one source, for life insurance policies. Conestoga is comfortable with this relationship because the policy provider is entirely independent from Conestoga and only acquires policies issued by U.S. legal reserve life insurance companies rated "A" or better by the A.M. Best Company. All policies have been in existence for a minimum of two (2) years. Prior to their acquisition, all premiums have been paid by the policies' original owners. Conestoga takes an average of two estimates of life expectancy to develop the life expectancy to be applied to a particular policy, or a combination of an underwritten life expectancy report and a life expectancy issued by the United States Social Security Administration.

(*Id.* at 145-52 (formatting original).)

The PPM also had a section about Conestoga and the other entities associated with the

9

Conestoga investment. (*Id.* at 134-38.) It explained that "[t]he Conestoga business model utilizes multiple independent entities to maintain the integrity of the product and promote accuracy and efficiency," and that "[t]he use of independent entities, including an escrow agent, accounting firm, custodial bank, and compliance law firm, ensures that checks and balances are built into the Conestoga model." (*Id.* at 134.)

Beginning in May 2015, the PPMs included a section about McDermott's February 2015 indictments. (*Id.* at 110-11, 187-88.) It explained that the indictments related to his previous involvement as a licensee of RV and are unrelated to his involvement in Conestoga. (*Id.* at 110, 187.) It explained that RV was placed into receivership in May 2010, and that the same allegations made in the indictments were the subject of a 2012 court-approved settlement agreement where the parties, including the State of Texas, agreed to release all claims against McDermott arising out of his involvement in RV. (*Id.* at 110-11, 187.) It noted that "McDermott denies the allegations in the indictments, and will vigorously defend his rights through the judicial process." (*Id.*) A footnote explained that similar indictments were issued against "the principal of Conestoga's primary policy provider, also related to such individual's involvement with RV"; that "[s]uch individual also entered into a similar settlement agreement"; and that "[t]he indictments are not related to the policy provider's involvement with Conestoga." (*Id.* at 110 n.3, 187 n.1.)

### 3.    *PSS*

The PSS is a chart of the available policies that contained key information about each policy, including amount invested, purported life expectancy, premium reserve period, payout at maturity, and estimated annual premium cost. (doc. 197 at 21.) As reflected in the two example

PSSs copied in the second amended complaint, CILLC is the only defendant listed. (*Id.* at 21-22.)[6]

### 4.    Welcome Letter

Plaintiffs allege that the Welcome Letter sent to investors participating in the Conestoga investment provided the same life expectancy and premium data from the PSS, but it did not disclose that the data derived from JSS or that the premium costs would increase. (*Id.* at 26.) It referred to Provident as "Custodian for your Traditional IRA and Escrow Agent for Conestoga International, LLC." (*Id.*) It also instructed the investor to notify Provident within ten days if the investor wanted to reject any of the selected policies. (*Id.*)

## C.    Conestoga Investors

Plaintiffs are over 110 individuals, trusts, estates, and other persons that collectively invested over $20,000,000 in Conestoga policies at different times between 2010 and 2017. (doc. 197 at 48-119.) They assert that "[i]nvestors were never informed that (a) the estimated annual premiums were provided by JSS, an entity with a prior history of providing false life expectancy and premium information in connection with life settlement scams; (b) that the annual premiums on the policies would increase each year; and (c) that the actual expected premium when investors would have to make additional payments, would be 'more than the amount listed as the 'Estimated Annual Premium.'" (*Id.* at 25.)

In 2020, CTS sued JSS and the firms that provided the life expectancies in Texas state court, "alleging that the life expectancies for the Conestoga policies were fraudulent." (*Id.* at 35.) It alleged that the life expectancies "were prepared in a fraudulent or reckless manner rather than

---

[6]"Almost every investor received a PSS substantially similar in form, with only minor variations to the form throughout Conestoga's history." (*Id.* at 197.)

according to any accepted and established methods in the industry and based on any industry data." (*Id.* at 35-36.) It also alleged that the cost calculations performed by JSS "were performed in a negligent, reckless, and/or fraudulent manner" and that "the cost estimates have turned out to be inexcusably too low." (*Id.* at 36.) CTS's complaint against JSS claims that "Conestoga knew at least as of January 4, 2013 that JSS had been accused of falsifying such data." (*Id.*)

Plaintiffs' second amended complaint alleges that none of the investors has made a profit on the Conestoga investments, and many investors "have lost their entire investment" and "continue to face high premium demands backed by the threat of forfeiture for no value if they fail to pay promptly." (*Id.* at 4.) They seek to recover monetary and non-monetary damages from the defendants, as well as to disgorge them "of all benefits that they received as a result of their misconduct." (*Id.* at 128.) They also seek "any and all preliminary or permanent relief under law or equity that is just and appropriate, including a full accounting[,] declaratory relief, and appointment of a receiver to manage the Conestoga Trust." (*Id.*)

### 1.    *Civil Conspiracy*

Plaintiffs assert a civil conspiracy claim against all the defendants, alleging they conspired to deceive and defraud them "into purchasing fractional interests in Conestoga life settlement contracts" and did so "through the use of false and misleading representations and material omissions." (*Id.* at 119.) They claim Conestoga and McDermott (collectively Defendants) committed the following overt acts in furtherance of the conspiracy: "CSS and/or CILLC purchased and marketed the life settlement contracts to investors using false and misleading representations and material omissions;" "CTS purported to serve as a fiduciary managing the Conestoga Trust;" and "McDermott formed and operated CSS and CILLC and was the mastermind

of the entire Conestoga operation." (*Id.* at 119-20.)

### 2. *Common Law Fraud, Fraud by Nondisclosure, and Federal Securities Fraud*

Plaintiffs also assert claims against all the defendants for common law fraud, fraud by non-disclosure, and Rule 10b-5 federal securities fraud, alleging that they made material misrepresentations in the PSS, PPM, Brochure, and Welcome Letter provided to them directly, or by Conestoga sales agents, including:

> (a) that the Conestoga investments were "safe," low-risk investments; (b) that the Conestoga investments did not involve any "moving parts" other than time; (c) that the life expectancies were the product of a sound estimating methodology; (d) that the estimated annual premium amounts quoted on the PSS were a reasonable estimate of future premiums that investors might be required to pay; (e) that the life expectancies were "conservative" and similar statements to that effect; (f) that the insured persons on the policies were in poor health and/or had degenerative health conditions; (g) that Provident would serve as an "escrow agent" and hold investors' funds; and (h) that sales commissions would be limited to certain amounts and only paid to certain persons.

(*Id.* at 121.) They also allege the defendants "omitted, concealed, and otherwise failed to disclose material facts known to them that would have affected a reasonable investor's decision whether to invest with Conestoga," including the following:

> (a) that JSS had provided all of the life expectancy, premium cost, and premium reserve information to Conestoga and Provident; (b) that JSS had previously provided similar fraudulent information in relation to prior life settlement scams, including retirement value; (c) that McDermott had been a principal of the Retirement Value scam; (d) that the annual premiums would substantially increase and far exceed the estimated annual premium quoted on the PSS; (e) that the escrow reserves would be insufficient to pay the increased premiums; (f) that the life expectancies were systematically understated and substantially less than the Social Security data indicated; (g) that the premium reserve period was substantially less than the life expectancy indicated [by] the SSA data; (h) that investors were highly likely to incur additional premium payments; and (i) that commissions would be paid to persons other than the individual sales agents in undisclosed amounts.

(*Id.* at 122-23.) Plaintiffs claim the defendants had a duty to disclose these facts to them because

"(a) their own statements, or statements attributable to them, were false or otherwise created misconceptions among investors that created a duty to correct; (b) they actually knew that the investors were purchasing fractional interests in the life settlements based on a false understanding of material facts; (c) they owed fiduciary duties to the investors, including the duty of candor, the duty of loyalty, and the duty to make full disclosure; and/or (d) the information needed to ascertain the truth was available to these Defendants and was not reasonably available to investors." (*Id.* at 123.) Additionally, these false and misleading statements and material omissions attributed to Defendants allegedly "occurred in connection with the sale or offer to sell investments in Conestoga life settlement contracts, which are securities as defined in section 3(a)(1) of the Securities and Exchange Act and elsewhere under federal law." (*Id.* at 126.)

### 3. Breach of Fiduciary Duty

Plaintiffs also assert a breach of fiduciary duty claim against only CTS and Provident, alleging that CTS owes fiduciary duties to them "because it is trustee of the Conestoga Trust," and they "placed trust and confidence in CTS in relation to its service as trustee." (*Id.* at 124-25.) CTS allegedly breached its fiduciary duties by "participating in a scheme to defraud Plaintiffs and the class members and failing to disclose the fraud." (*Id.* at 125.)

### 4. Declaratory Judgment

Plaintiffs assert a claim against Conestoga for declaratory judgment under 28 U.S.C. § 2201, alleging that "[t]here is an immediate justiciable controversy regarding whether, and to what extent, Plaintiffs should be required to pay ongoing insurance charges and premiums relating to the underlying insurance policies." (*Id.* at 127.) "Conestoga continues to demand that Plaintiffs make payments on account of premiums allegedly owed on the underlying insurance policies,"

even though "[t]he premiums demanded are not consistent with the representations regarding timing and amount of premiums made at the time of sale." (*Id.*) Plaintiffs seek the following judicial declarations:

> (1) Defendants have wrongfully demanded that Plaintiffs pay undisclosed insurance costs and premiums; (2) Plaintiffs shall not be required to pay and do not owe insurance charges, including premium payments, that were not properly disclosed; (3) to the extent Plaintiffs may incur any obligation to pay additional insurance costs or premiums in the future, such payment obligations shall only begin, if at all, after the date the premium reserves were set to expire on the respective policy for which premiums are demanded, in accordance with the PSS; (4) any premium obligations that Plaintiffs may incur shall be offset by the amount by which such Plaintiffs have already paid additional premiums earlier, or in excess of, those stated in the PSS; and (5) Conestoga shall not forfeit any Plaintiff's interest for failing to pay premiums that were not properly disclosed.

(*Id.* at 127-28.)

## D.    <u>Procedural History</u>

On March 10, 2022, Defendants moved to dismiss the claims against them for failure to state a claim under Rules 9(b) and 12(b)(6). (doc. 208.) Plaintiffs responded on March 30, 2022, and Defendants replied on April 13, 2022. (docs. 213; 216.)

On April 20 and May 10, 2022, Provident and Defendants moved to stay all discovery and other proceedings during the pendency of the motions to dismiss under 15 U.S.C. § 78u-4(B)(3)(B). (docs. 219; 221.) On May 11, 2022, Plaintiffs moved to allow particularized discovery requests during the pendency of the motions to dismiss under § 78u-4(B)(3)(B). (doc. 223) The parties have filed responses and replies to all three motions. (docs. 222; 227-232.)[7]

---

[7]The second amended complaint also asserts claims against Provident. (*See* doc. 197.) A recommendation that the claims against it be dismissed for failure to state a claim is currently pending. (*See* doc. 235.)

## II.  MOTION TO DISMISS

Defendants move to dismiss all claims against them for failure to state a claim under Rule 12(b)(6). (doc. 208.)

### A.    <u>Rule 12(b)(6) Standard</u>

Rule 12(b)(6) allows motions to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Under the 12(b)(6) standard, a court cannot look beyond the face of the pleadings. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *see also Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000).

Pleadings must show specific, well-pleaded facts, not mere conclusory allegations to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). The court must accept those well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker*, 75 F.3d at 196. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). Nevertheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). The alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In short, a complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inference that the defendant is liable for the

misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (citations omitted). When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 683.

As noted, a court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. *Spivey*, 197 F.3d at 774; *Baker*, 75 F.3d at 196. When a party presents "matters outside the pleadings," a court has "complete discretion" to either accept or exclude the evidence for purposes of determining the motion. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988); *accord Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007). However, "[i]f ... matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Nevertheless, "pleadings" for purposes of a motion to dismiss include attachments to the complaint. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation omitted). Similarly, documents "attache[d] to a motion to dismiss are considered part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim[s]." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (citation omitted). It is also "clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Cinel v. Connick*, 15 F.3d 1338,

1343 n.6 (5th Cir. 1994). Documents falling in these categories may be properly considered without converting the motion to dismiss into a motion for summary judgment.

Here, Defendants attach copies of the four different versions of the PPM, McDermott's sworn declaration,[8] and the pleadings from the CTS lawsuit against JSS and the RV receivership action. (*See* doc. 209 at 4-34; 47-114; 124-91; 208-327.) Although these exhibits were not attached to the second amended complaint, they may be considered without treating the motion to dismiss as a summary judgment motion because they are either referred to in Plaintiffs' complaint and central to their claims or a matter of public record. *See Collins*, 224 F.3d at 498-99; *Norris*, 500 F.3d at 461 n.9; *see also Wang v. Prudential Ins. Co. of America*, 439 F. App'x 359, 363 (5th Cir. 2011) (holding that the district court "did not impermissibly consider documents outside of the record in deciding the motion to dismiss, as the documents referred to were public court filings"); Fed. R. Evid. 201(b)(2) (a court may take judicial notice of a fact when it "can be accurately and readily determined from sources whose accuracy cannot reasonably be disputed").

Defendants also attach copies of a "Verification of Accredited Investor Status" form, an "Important Disclosures" form, and an "Acknowledgement of Receipt of Private Placement Memorandum" form, which are not attached to or referenced in the second amended complaint or a matter of public record subject to judicial notice. (*See* doc. 209 at 193-94; 198-207.) They argue that these documents should be considered part of the pleadings because they are some of the documents Plaintiffs had to sign "for making the investments that form the basis of their claims." (doc. 216 at 9.) As discussed, documents attached to a defendant's motion to dismiss must be

---

[8]McDermott's sworn declaration, dated January 2, 2020, was originally filed in relation to a motion for class certification and provides background information about the Conestoga investment. (*See* doc. 94.) The second amended complaint cites to and includes excerpts from the declaration.

"central" to the plaintiff's claims to be considered part of the pleadings. *See Collins*, 224 F.3d at 498-99. Courts have found that "[d]ocuments 'are central when they are necessary to establish an element of one of the plaintiff's claims,' like a contract at issue in a breach of contract case, but are not central if [they] 'merely evidence of an element of the plaintiff's claim.'" *Tornado BUS Co. v. BUS & Coach Am. Corp.*, No. 3:14-CV-3231-M, 2015 WL 11120584, at *1 (N.D. Tex. Dec. 15, 2015) (quoting *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011). Further, "[d]ocuments used to support a defendant's affirmative defense appear not to fall within the exception." *In re Xtreme Power Inc.*, 563 B.R. 614, 629 (Bankr. W.D. Tex. 2016). Although Defendants' exhibits provide some context for Plaintiffs' claims and appear central to the defenses in this case, they are not necessary to establish an element of any of their claims. *See Kaye*, 453 B.R. at 662; *Scanlan*, 343 F.3d at 537 (holding that an investigative report attached to motion to dismiss was not central to plaintiffs' claims in personal injury and wrongful death action and was "much more central to the University Officials' defenses"); *see, e.g., Emerald Aerospace, LLC v. Boeing Co.*, No. 3:22-CV-0717-B, 2022 WL 16701941, at *4 (N.D. Tex. Nov. 3, 2022) (finding request for proposal documents attached to motion to dismiss may provide some context for the underlying dispute and "may be relevant to whether [plaintiff] was justified in relying on the promises it received from [defendant]," but they were not necessary to establish an element of plaintiff's claims, including fraud).[9]   Accordingly, these exhibits are not considered.

**B.    Fraud Claims**

Defendants argue that Plaintiffs' allegations in support of their claims for common law

---

[9]The recommended outcome of this motion remains the same with or without consideration of these exhibits.

fraud, fraud by nondisclosure, and federal securities fraud rely on improper "group pleading" and fail to meet the heightened pleading requirements under Rule 9(b) and the Private Securities Litigation Reform Act (PLSRA). (doc. 208 at 23.)

To state a securities fraud claim under Section 10(b) and Rule 10b–5 of the Securities Exchange Act, "a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of a material fact (3) made with scienter (4) on which the plaintiffs relied (5) that proximately caused the plaintiff's injury." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citation omitted).

In Texas,[10] the elements of common law fraud are: (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation, the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury. *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032-33 (5th Cir. 2010) (citing *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)). "A false representation is material if a reasonable

---

[10]Defendants contend that the law of the forum (Texas law) is applied for purposes of their motion to dismiss. (doc. 208 at 26 n.4.) "Absent notice by the parties that another state's law should apply and that the other state's law differs from Texas law, the court will apply Texas law to the dispute and presume the sister state's laws are the same." *Thermo Fisher Sci. Inc. v. Ducharme*, No. CV M-08-9, 2008 WL 11399557, at *2 (S.D. Tex. Sept. 30, 2008). Plaintiffs appear to agree that Texas law governs the common law claims because they cite to Texas law and Fifth Circuit cases applying Texas law. *See CIMC Vehicles Grp. Co. v. Direct Trailer, LP*, No. CIV.A. H-10-709, 2012 WL 4017985, at *9 (S.D. Tex. Aug. 24, 2012), *adopted by* 2012 WL 4018200 (S.D. Tex. Sept. 12, 2012) ("By uniformly relying on Texas law, the parties agree that it applies to their controversy. Absent any indication in the record that any other law should apply, the court applies Texas law."). A party who fails to brief the laws of other states forfeits any choice of law argument. *See Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 n.2 (5th Cir. 2009) ("[B]y failing to brief any other state's law, the parties have forfeited any choice of law argument.").

person would attach importance to and be induced to act on the information." *Id.* at 1033 (citing *Citizens Nat'l Bank v. Allen Rae Invs.*, 142 S.W.3d 459, 478-79 (Tex.App.—Fort Worth 2004, no pet.)).

"Fraud by non-disclosure, a subcategory of fraud, occurs when a party has a duty to disclose certain information and fails to disclose it." *CBE Grp., Inc. v. Lexington L. Firm*, 993 F.3d 346, 353 (5th Cir. 2021) (quoting *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019)). To state a claim for fraud by non-disclosure under Texas law, the plaintiff must allege that: "(1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury." *Bombardier*, 572 S.W.3d at 219-20. A duty to disclose arises by operation of law when: (1) there is a confidential or fiduciary relationship between the parties; (2) one party learns that his previous affirmative statement was false or misleading; (3) one party knows that the other party is relying on a concealed fact, provided that the concealing party also knows that the relying party is ignorant of the concealed fact and does not have an equal opportunity to discover the truth; or (4) one party makes a partial disclosure voluntarily and conveys a false impression. *Union Pac. Res. Group v. Rhone Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (citing *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex.App.-Forth Worth 1998, pet. denied)).

"Both federal securities claims and state-law fraud claims are subject to the pleading requirements of Rule 9(b)." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir.

2008) (citations omitted). Rule 9(b) contains a heightened pleading standard and requires a plaintiff to plead the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b); *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997).[11] "Put simply, Rule 9(b) requires the who, what, when, where, and how to be laid out" with respect to a fraud claim. *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (internal quotations omitted). However, the amount of particularity required for pleading fraud differs from case to case. *See id.* "A complaint can be long-winded, even prolix, without pleading with particularity ... [i]ndeed, such a garrulous style is not an uncommon mask for an absence of detail." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (citing *Williams*, 112 F.3d at 178).[12]

The Fifth Circuit has made clear its disapproval of "group pleading," particularly with respect to fraud claims. *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015) (citing *Southland*, 365 F.3d at 365). "When multiple defendants are alleged to have committed fraudulent acts, a

---

[11]The PSLRA, which governs federal securities fraud claims, "reinforces the particularity requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362-63 (5th Cir. 2004) (citing *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997)). "The PSLRA *also* requires that the complaint "with respect to *each* act or omission alleged" to be false or misleading "state with *particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)) (emphasis original).

[12]A motion to dismiss for failure to plead fraud with particularity under Rule 9(b) is treated the same as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *McCall v. Genentech, Inc.*, No. 3:10-CV-1747-B, 2011 WL 2312280, at *3 (N.D. Tex. June 9, 2011) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)).

party claiming fraud 'must plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant; the plaintiff is obligated to distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud.'" *Hidden Values, Inc. v. Wade*, No. 3:11-CV-1917-L, 2012 WL 1836087, at *4 (N.D. Tex. May 18, 2012) (quoting *Coates v. Heartland Wireless Comms., Inc.*, 26 F.Supp.2d 910, 915 (N.D.Tex. 1998)). General allegations that lump all defendants together without segregating "the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b)." *In re Urcarco Sec. Lit.*, 148 F.R.D. 561, 569 (N.D. Tex. 1993), *aff'd sub nom. Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994). "Rather, the fraud claim must 'identify specific statements' made by the party who allegedly made the representations." *7-Eleven Inc. v. Puerto Rico-7 Inc.*, No. 3:08-CV-00140-B, 2008 WL 4951502, at *2 (N.D. Tex. Nov. 19, 2008) (citing *Williams*, 112 F.3d at 179); *see In re Parkcentral Glob. Litig.*, 884 F. Supp.2d 464, 471 (N.D. Tex. 2012) ("It is impermissible to make general allegations that lump all defendants together; rather, the complaint must segregate the alleged wrongdoing of one from another.").

Although Rule 9(b) relaxes the particularity requirement for scienter, "simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b)." *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir.1994); *see* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). "The plaintiffs must set forth *specific facts* supporting an inference of fraud." *Id.* (emphasis in original). They may sufficiently allege intent by pointing out circumstances or facts that reasonably indicate motive to commit fraud or "conscious behavior on the part of the defendant." *Dorsey*, 540 F.3d at 339 (quoting *Herrmann*

23

*Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 565 (5th Cir. 2002)).[13] "The Fifth Circuit has also rejected the group pleading approach to scienter." *Knutson v. Harris*, No. 3:17-CV-2618-BK, 2018 WL 4281557, at *3 (N.D. Tex. Sept. 6, 2018) (citing *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*, 537 F.3d 527, 533 (5th Cir. 2008)).

Plaintiffs globally allege that all the defendants made material misrepresentations and omissions to them "related to the marketing, sale, and service of fractional interests in the Conestoga life settlement contracts," which "were made in the PSS, PPM, Brochure, and Welcome Letter, and by Conestoga sales agents." (doc. 197 at 121, 126.) The alleged material misrepresentations include that the Conestoga investments were safe, that the life expectancies and annual premium amounts were reasonably accurate, and that Provident would serve as an escrow agent and hold investors' funds. (*Id.*) Plaintiffs also allege that these defendants "omitted, concealed, and otherwise failed to disclose material facts known to them that would have affected a reasonable investor's decision whether to invest with Conestoga," including that JSS had provided the life expectancy and premium information for the policies, that JSS had been accused of fraud with regard to similar information in a prior life settlement scheme that also involved McDermott, that premium costs on the policies were expected to increase over time and exceed amounts quoted in the PSS, that the escrow reserves would be insufficient to pay the increased premiums, and that the information on life expectancies and premium reserve period was understated based on Social Security data. (*Id.* at 122-23, 126.)

---

[13] When the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, fraud pleadings may be based on information and belief, provided that the complaint sets forth the factual basis for such belief. *See Thompson*, 125 F.3d at 903. "However, this luxury 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (citation omitted).

Even though the second amended complaint specifically identifies the material misrepresentations contained in the marketing materials, as well as the material facts that were not disclosed and should have been in the marketing materials, it lacks particularity as to which defendant created or made the misrepresentations or authorized the omissions in those marketing materials. As discussed, allegations that "lump all defendants together, failing to segregate the alleged wrongdoing of one from those of another," do not satisfy the requirements of Rule 9(b). *USA ex rel. Barrett v. Johnson Controls, Inc.*, No. 3:01-CV-1641-M, 2003 WL 21500400, at *10 (N.D. Tex. Apr. 9, 2003); *see Ingalls v. Edgewater Priv. Equity Fund III, L.P.*, No. CIV.A. H-05-1392, 2005 WL 2647962, at *5 (S.D. Tex. Oct. 17, 2005) (explaining that Rule 9(b)'s requirement of pleading fraud with specificity "requires that 'at a minimum' for each alleged misstatement or omission, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false") (citation omitted).

Courts in this district have held that general allegations of participation and involvement by multiple defendants in the preparation of marketing materials, without more, is insufficient to meet the requirements of Rule 9(b) or the PLSRA. For example, in *Billitteri v. Securities America, Inc.*, No. 09-CV-1568-F, 2010 WL 6785484 (N.D. Tex. July 26, 2010), a group of investors who owned non-publicly-traded offerings in a bankrupt holding company sued multiple entities, including the brokers that sold them the offerings, for state securities law violations. The investors alleged that the offerings were made to them through PPMs that contained materially false and misleading statements and failed to disclose material information about the investments. The

PPMs were issued by the holding company entities and disseminated by the brokers. They claimed that the brokers were connected to the fraudulent conduct of the bankrupt holding company and other defendants because the brokers "participated in the drafting, preparation, approval, due diligence and/or dissemination of various materially false and misleading statements contained in the PPMs." *Id.* at *3. The court found that although the investors had "carefully and thoroughly explain[ed] the underlying wrongful conduct" of the other parties and had identified the materially untrue statements and material omissions in the PPMs, they had "fail[ed] to state with sufficient particularity any broker defendant's role in the described fraud." *Id.* at *6. The investors had generally alleged that the brokers were involved in the drafting of the PPMs, but "Rule 9(b) requires [them] to identify the facts underlying each [broker's] involvement in the production or drafting of the allegedly false or misleading PPMs." *Id.* at *7. To survive dismissal under Rules 9(b) and 12(b)(6), the investors had to "connect, with greater specificity, the individual [b]roker [d]efendants to their alleged involvement in the making of the allegedly materially false and misleading statements." *Id.* Because the investors failed to plead each broker's role in the alleged misconduct with sufficient specificity, the court granted the brokers' motion to dismiss and dismissed the state securities fraud claim. *Id.* at *8.[14]

In *Knutson v. Harris*, No. 3:17-CV-2618-BK, 2018 WL 4281557 (N.D. Tex. Sept. 6, 2018), the securities fraud claims centered on material misrepresentations and omissions made in a PPM for investments marketed by defendants. Plaintiffs alleged that defendants "played various roles" in the investment business model, and they "wrote or were responsible for" the PPM. *Id.* at *1.

---

[14]Although this case involved violations of the Texas Securities Act, the court found that a state securities fraud claim must also satisfy the heightened pleading requirements of Rule 9(b). *See Billitteri*, 2010 WL 6785484, at *4 (citing *Dorsey*, 540 F.3d at 343-44).

The court found that plaintiffs' "vague reference to 'the Defendants' constitutes impermissible group pleading," and that their "bare assertion that 'Defendants' 'wrote or were responsible for the [ ] PPM does not, in itself, connect any individual Defendant to the allegedly fraudulent statements contained therein." *Id.* at *4-5. "[C]ourts may not construe allegations directed against defendants as a group as imputable to any individual defendant, absent a connection between the allegedly fraudulent statement and the individual defendant." *Id.* at *4 (citing *Southland*, 365 F.3d at 365). Because plaintiffs failed to allege a factual link between any of the individual defendants and the specifically alleged misrepresentation in the PPM as required under Rule 9(b) and the PSLRA, the court dismissed their federal securities claims. (*Id.* at *6.)

As in *Billitteri* and *Knutson*, the fraud claims against the six individual defendants are all predicated on material misrepresentations and omissions that were made in the Brochure, PPM, PSS, and Welcome Letter, and communicated by a sales agent. The second amended complaint refers to the Brochure, PPM, and PSS as the "Conestoga written marketing materials"; CILLC is identified on the front of the PPM and the top of the PSS. (*Id.* at 20-25, 27-35.) It uses the term "Conestoga" to refer to CSS, CILLC, and CTS collectively, and nearly all the factual allegations concerning fraud are directed at "Conestoga" or the defendants as a group. The second amended complaint generally alleges that all the defendants had some involvement in creating the marketing materials, but it fails to allege specific facts sufficient to show that each individual defendant made the misrepresentations in the marketing materials or determined what information should or should not be included in those materials. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 288 (5th Cir. 2006) (finding complaint for securities fraud violations failed "because it only alleged a group of defendants made statements; in other words, it did not identify which defendant(s) made

a statement and who remained silent"); *see, e.g., Ogbonna v. USPLabs, LLC*, No. EP-13-CV-347-KC, 2014 WL 2592097, at *11 (W.D. Tex. June 10, 2014) (finding allegations that defendants issued press releases and other statements without identifying "which defendant made which allegedly fraudulent misrepresentation" in those publications failed to satisfy Rule 9(b)); *Setliff v. Zoccam Techs., Inc.*, No. 3:21-CV-2025-B, 2022 WL 4240893, at *16 (N.D. Tex. Sept. 13, 2022) (dismissing common law fraud and fraud by nondisclosure claims because allegations that defendants failed to disclose material information in document they published "impermissibly group[ed] [d]efendants together to impute the fraud against both"). Further, Plaintiffs have not set forth sufficient facts to show that each defendant decided or had the authority to decide what information to include in or omit from the marketing materials.

Although JSS is identified as the source of the false and misleading statements in the marketing materials, the second amended complaint does not specifically plead the connection between each individual defendant and each alleged false statement or material omission. *See Knutson*, 2018 WL 4281557, at *5 ("Indeed, no attempt is made to connect any individual Defendant with these allegedly fraudulent statements."). "Allegations about another person's knowledge, or 'the defendants'' collective knowledge, are insufficient. The plaintiffs must plead facts that give rise to a strong inference of scienter for each individual defendant for each purported misstatement." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 891-92 (S.D. Tex. 2017), *aff'd on other grounds sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019) (citing *Southland*, 365 F.3d at 366).

Even though Plaintiffs allege facts about each defendant's role in the Conestoga investment, their group pleading allegations that all the defendants made the misrepresentations

28

and omissions in the marketing materials are inadequate to raise a reasonable inference of each individual defendant's conscious participation in the fraudulent conduct giving rise to the fraud claims against each defendant. "The complaint must distinguish the role, intent, and knowledge of *each* defendant." *Kohut v. KBR, Inc.*, No. CV H-14-1287, 2015 WL 11995250, at *11 (S.D. Tex. Sept. 3, 2015) (citing *Southland*, 365 F.3d at 365) (emphasis added). No other facts are alleged to support an inference that the material misrepresentations from statements or omissions in the marketing materials are specifically attributable to each defendant. Because Plaintiffs' allegations about misrepresentations and omissions are attributed to defendants as a group and do not give them fair notice of the nature of each defendant's alleged participation in the alleged fraud, they fail to sufficiently state a fraud claim with particularity against Defendants. *See Billitteri*, 2010 WL 6785484, at *7-8; *Knutson*, 2018 WL 4281557, at *4-5; *Southland*, 365 F.3d at 365 (holding that plaintiffs claiming securities fraud against multiple defendants must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud") (emphasis original); *see, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp.2d 504, 570 (S.D. Tex. 2011) (finding fraud claim failed to meet the requirement of particularity under Rule 9(b) because complaint failed to link the defendants in any specific way to any alleged fraudulent misrepresentation or omissions); *Ergonomic Lighting Sys., Inc. v. Com. Petroleum Equip./USALCO*, No. SA-02-CA-0031 RF(NN), 2003 WL 22436101, at *3 (W.D. Tex. Oct. 21, 2003) (finding allegations that defendants made affirmative misrepresentations and omitted to provide material information that did specify which defendant made which material misrepresentation or omission failed to comply with Rule 9(b) pleading requirements); *In re Urcarco Sec. Litig.*, 148 F.R.D. at 569 (finding that plaintiff's "lumping together" of the "thirteen

29

named defendants, three of which are supposed to represent a defendant class of fifty firms" simply as "defendants" failed to "segregate the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b)").

Because Plaintiffs have failed to meet the heightened pleading requirement of Rule 9(b) or the PSLRA, Defendants' motion to dismiss their claims against them for common law fraud, fraud by nondisclosure, and securities fraud for failure to state a claim should be granted.[15]

## C.    Civil Conspiracy

Defendants argue that Plaintiffs' civil conspiracy claim against them fails for the same reasons as their fraud claims. (doc. 208 at 40.)

Under Texas law, a civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Rodgers v. City of Lancaster Police*, No. 3:13-CV-2031-M-BH, 2017 WL 457084, at *16 (N.D. Tex. Jan. 6, 2017), *adopted by* 2017 WL 447216 (N.D. Tex. Feb. 2, 2017) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). "[I]n short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy." *I Love Omni, LLC v. Omnitrition Int'l, Inc.*, No. 3:16-CV-2410-G, 2017 WL 1281130, at *3 (N.D. Tex. Apr. 6, 2017) (quoting *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968)). "[A] defendant's liability for conspiracy

---

[15] Because all fraud claims against Defendants are subject to dismissal under Rule 9(b), it is not necessary to reach their other arguments for dismissal of those claims. (*See* doc. 20 at 24-40.)

depends on [his or her] participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Additionally, it requires a specific intent. *I Love Omni*, 2017 WL 1281130, at *3.

Here, Plaintiffs allege that Defendants conspired with the other defendants to deceive and defraud them into purchasing interests in Conestoga life settlement contracts, and that they did so through false and misleading representations and material omissions. (*See* doc. 197 at 119-20.) As discussed, they have failed to satisfy the heightened pleading requirements of Rule 9(b) on any of their fraud claims. *See* Fed. R. Civ. P. 9(b). Without some underlying unlawful or tortious act, they cannot hold Defendants liable for civil conspiracy. *See Tilton*, 925 S.W.2d at 681; *Askanase v. Fatjo*, 130 F.3d 657, 676 (5th Cir. 1997) (holding that "because the fraud claim fails[,] the fraud based conspiracy claim must fail also"). Plaintiffs' speculative and conclusory allegations regarding the past involvement by some defendants in RV do not plausibly show a "preconceived plan" by each defendant to commit fraud or to do anything in furtherance of committing fraud. *Samsung Elecs. Am., Inc.*, 2017 WL 635031, at *13.

Because Plaintiffs have failed to plead sufficient allegations to support the elements of their civil conspiracy claim against Defendants, they fail to state a claim. *See Askanase v. Fatjo*, 130 F.3d at 676; *Mathis v. DCR Mortg. III Sub, I, LLC*, 952 F.Supp.2d 828, 836 (W.D. Tex. 2013) (finding plaintiff's civil conspiracy claim was predicated primarily on his fraud claims, and it failed alongside those claims).[16]  Defendants' motion to dismiss this claim should be granted.

---

[16]A fiduciary duty claim is also asserted against CTS, but the parties do not address whether it provides a separate underlying unlawful or tortious act for the civil conspiracy claim. Because the fiduciary duty claim should be dismissed for the reasons discussed below, even assuming that the second amended complaint sufficiently alleged civil conspiracy based on the fiduciary duty claim, the conspiracy claim still fails as a matter of law.

D.    <u>**Breach of Fiduciary Duty**</u>

Defendants argue that the breach of fiduciary duty claim against CTS should be dismissed because it is based on the same allegations as the fraud claims, and Plaintiffs have failed to satisfy Rule 9(b) pleading requirements. (doc. 208 at 32.)

Under Texas law,[17] the essential elements of a breach of fiduciary duty claim are "(1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 581 (5th Cir. 2015) (quoting *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.)); *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) ("A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."). In Texas, "[a] fiduciary duty generally exists between a trustee and a beneficiary." *Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 573 F. Supp.3d 1161, 1167 (S.D. Tex. 2021) (citing *Healey v. Healey*, 529 S.W.3d 124, 135 (Tex. App.—Tyler 2017, pet. denied); *accord In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 185 (Del. Ch. 2020). "A trustee owes a trust beneficiary an unwavering duty of good faith, fair dealing, loyalty and fidelity over the trust's affairs and its corpus." *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 735 (Tex. App.—Corpus Christi–Edinburg 1994, writ denied); *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251

---

[17]Plaintiffs rely on Texas law in support of their fiduciary duty claims against CTS. Even though Conestoga Trust is a Delaware statutory trust and CTS is a Delaware limited liability corporation, the elements for a fiduciary duty claim against a trustee appear the same under both Texas and Delaware law. Regardless of which state's law applies to this claim, as discussed fully below, the claim is subject to the federal pleading standard of Rule 9(b) and fails for the same reason as the fraud claims.

A.3d at 185 ("At common law, the 'duties of a trustee to trust beneficiaries' include 'loyalty, good faith, and due care.'") (citation omitted).

"While generally breach of fiduciary duty claims must only meet the requirements of Rule 8(a), when the claim is predicated on fraudulent conduct, courts require Rule 9(b) specificity." *R.P. Small Corp. v. Land Dep't, Inc.*, 505 F. Supp.3d 681, 716 (S.D. Tex. 2020) (citations omitted). Courts in this circuit have applied the heightened pleading requirements of Rule 9(b) when the claim for breach of fiduciary duty is "based on the same allegations as a fraud claim." *See Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*, No. 3:11-CV-3125-L, 2014 WL 4851558, at *27 (N.D. Tex. Sept. 30, 2014); *see also Brown v. Bilek*, 401 F. App'x 889, 893 (5th Cir. 2010) (explaining that courts have extended the particularity requirement of Rule 9(b) to breach of fiduciary duty claims "predicated on fraud").

Here, the second amended complaint asserts that CTS owed fiduciary duties to Plaintiffs "because it is trustee of the Conestoga Trust," and because they "placed trust and confidence in CTS in relation to its service as trustee." (doc. 197 at 124-25.) It alleges in conclusory fashion that CTS breached its fiduciary duties by "participating in a scheme to defraud Plaintiffs . . . and failing to disclose the fraud." (*Id.* at 125.) The fiduciary duty claim against CTS is clearly based on allegations of fraud. *See Town N. Bank*, 2014 WL 4851558, *27; *see, e.g., Litson-Gruenber v. JPMorgan Chase & Co.*, No. CIV.A. 7:09-CV-056-0, 2009 WL 4884426, at *4 (N.D. Tex. Dec. 16, 2009) (finding breach of fiduciary duty claim based on bank's alleged participation in Ponzi scheme and failure to detect fraud of other defendants was premised on allegations of fraud and subject to Rule 9(b)'s pleading standard); *Ingalls v. Edgewater Priv. Equity Fund III, L.P.*, CIV.A. H-05-1392, 2005 WL 2647962, at *5-6 (S.D. Tex. Oct. 17, 2005) (applying Rule 9(b) standard to

claim that defendants breached fiduciary duties owed to plaintiff "by defrauding it of money and business opportunities" because such a claim "sounds in fraud").

Plaintiffs argue that their breach of fiduciary duty claim is based on CTS's violations of its fiduciary duties as trustee and not "solely on the fraud claims," but the second amended complaint relies on the same operative facts for this claim as for the common law fraud, fraud by nondisclosure, and securities fraud claims. (doc. 213 at 27-28.) When, as here, "the claimed breach rests upon the same allegations as a fraud claim," the breach of fiduciary duty claim is premised on fraud and therefore subject to Rule 9(b). *Brown v. Whitcraft*, No. CIV.A.3:08-CV-0186-D, 2008 WL 2066929, at *4 (N.D. Tex. May 15, 2008) (quoting *Peters v. Metro. Life Ins. Co.*, 164 F. Supp. 2d 830, 836 (S.D. Miss. 2001)). Plaintiffs contend that the fiduciary duty claim "is different from the claims for fraud" because CTS "continues to breach its fiduciary duties" by "refus[ing] to disclose the truth about the life settlement investments" and "by refusing to make a full accounting for the financial transactions conducted with their money." (doc. 213 at 28.) These new allegations were not pled in the second amended complaint and are not part of the pleadings to be considered for purposes of the motion to dismiss, however. *See Guzman v. Nationstar Mortg. LLC*, No. 4:17-CV-00823-O-BP, 2017 WL 6597959, at *2 (N.D. Tex. Dec. 8, 2017), *adopted by* 2017 WL 6594199 (N.D. Tex. Dec. 26, 2017) (dismissing plaintiff's claim after refusing to consider a factual assertion that was first raised in his response to the motion to dismiss); *Middleton v. Life Ins. Co. of North America*, H-09-CV-3270, 2010 WL 582552, *5 (S.D. Tex. Feb. 12, 2010) (finding claim raised for first time in response to motion to dismiss was not properly before the court); *see also Renfrow v. CTX Mortg. Co.*, LLC, No. 3:11-CV-3132-L, 2012 WL 3582752, at *4 (N.D. Tex. Aug. 20, 2012) (explaining that "[a]llegations outside of the Petition may not be considered by the

court" in determining a Rule 12(b)(6) motion).

Because Plaintiffs' breach of fiduciary duty claim is based on the same allegations as their fraud claims, it is subject to the heightened pleading standard of Rule 9(b). *See R.P. Small Corp.*, 505 F. Supp.3d at 716; *Brown*, 2008 WL 2066929, at *4 ("[B]y premising his breach of fiduciary duty claim on fraud, the Receiver subjects his pleadings to the heightened pleading standard of Rule 9(b)."). As discussed, the second amended complaint relies on impermissible group pleading in violation of Rule 9(b) and the PSLRA and fails to meet the pleading requirements for fraud claims. *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 857 (N.D. Tex. 2004) (holding that "allegations in the Complaint made against 'Defendants' (plural or group) do not meet the requirements of pleading allegations of fraud").

Because the Rule 9(b) standard applies to Plaintiffs' breach of fiduciary duty claim against CTS, it fails for the same reasons each of their fraud claims, and it should be dismissed. *Ingalls*, 2005 WL 2647962, at *5-6 (S.D. Tex. Oct. 17, 2005) (dismissing fraud-based fiduciary duty claim because allegations of fraud that grouped defendants together failed to meet the particularity requirement of Rule 9(b)).

**E.    Declaratory Judgment**

Defendants argue that the claim for declaratory relief should be dismissed as "duplicative and unnecessary." (doc. 208 at 41.)

The federal Declaratory Judgment Act (Act) provides that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Act "does not create a

substantive cause of action" and "is merely a vehicle that allows a party to obtain an early adjudication of an actual controversy arising under other substantive law." *Metropcs Wireless, Inc. v. Virgin Mobile USA, L.P.*, 3:08-CV-165-D, 2009 WL 3075205, at *19 (N.D. Tex. Sept. 25, 2009) (citations and quotations omitted). The Act is an authorization and not a command and allows federal courts broad, but not unfettered, discretion to grant or refuse declaratory judgment. *Id.* Nevertheless, "[i]f a request for a declaratory judgment adds nothing to an existing lawsuit, it need not be permitted." *Cypress/Spanish Ft. I, LP v. Prof'l Serv. Indus., Inc.*, 814 F. Supp.2d 698, 710 (N.D. Tex. 2011) (citing *Madry v. Fina Oil & Chem. Co.*, 44 F.3d 1004, 1994 WL 733494, at *2 (5th Cir. 1994)); *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("If a district court, in the sound exercise of its judgment, determines after a complaint is filed that a declaratory judgment will serve no useful purpose, it cannot be incumbent upon that court to proceed to the merits before staying or dismissing the action."). "Courts in the Fifth Circuit regularly reject declaratory judgment claims seeking the resolution of issues that will be resolved as part of the claims in the lawsuit." *Am. Equip. Co. v. Turner Bros. Crane & Rigging, LLC*, No. 4:13-CV-2011, 2014 WL 3543720, at *4 (S.D. Tex. July 14, 2014) (citing cases).

Here, the second amended complaint asserts that "[t]here is an immediate justiciable controversy regarding whether, and to what extent, Plaintiffs should be required to pay ongoing insurance charges and premiums relating to the underlying insurance policies." (doc. 197 at 127.) Plaintiffs seek judicial declarations that "(1) Defendants have wrongfully demanded that Plaintiffs pay undisclosed insurance costs and premiums; (2) Plaintiffs shall not be required to pay and do not owe insurance charges, including premium payments, that were not properly disclosed; (3) to the extent Plaintiffs may incur any obligation to pay additional insurance costs or premiums in the

future, such payment obligations shall only begin, if at all, after the date the premium reserves were set to expire on the respective policy for which premiums are demanded, in accordance with the PSS; (4) any premium obligations that Plaintiffs may incur shall be offset by the amount by which such Plaintiffs have already paid additional premiums earlier, or in excess of, those stated in the PSS; and (5) Conestoga shall not forfeit any Plaintiff's interest for failing to pay premiums that were not properly disclosed." (*Id.* at 127-28.) As discussed, Plaintiffs assert separate claims for fraud, civil conspiracy, and breach of fiduciary duty, alleging that they sustained financial injuries because of Defendants' tortious conduct in connection with the Conestoga investment, and they seek to recover monetary damages for those past injuries. In contrast, their request for declaratory relief seeks to define the rights, duties, and obligations with respect to their interests in the Conestoga life settlement policies going forward. *Trammell Crow Residential Co. v. Virginia Sur. Co.*, 643 F. Supp.2d 844, 856 (N.D. Tex. 2008) (finding declaratory judgment claim that defendant had "a continuing duty" to perform under the contract was "not duplicative of [plaintiff's] breach of contract claim" because the breach of contract claim only remedied defendant's past breach); *5436, LLC v. CBS Corp.*, No. H-08-3097, 2009 WL 3378379, at *17 (S.D. Tex. Oct. 16, 2009) (denying motion to dismiss declaratory judgment counterclaim seeking to define "the ongoing and future duties of the parties under the governing contract").

Because the declaratory relief requested by Plaintiffs is not redundant of their other claims, Defendants' motion to dismiss this claim as "duplicative and unnecessary" should be denied.

### III.   REQUEST FOR LEAVE TO AMEND

In the conclusion section of their response, Plaintiffs state that "if the Court considers the motion to have merit, [they] respectfully request leave to amend their pleading." (doc. 213 at 29.)

They do not identify any additional facts that they seek to include in a third amended complaint, and they also fail to attach a proposed amended pleading as an exhibit. Their request does not comply with Local Rule 15.1 of the Local Civil Rules for the Northern District of Texas, which provides that when a party files a motion for leave to file an amended pleading, the party must attach the proposed amended pleading as an exhibit. Compliance with the rules of procedure is required of all parties; leave to amend may be denied for non-compliance. *Shabazz v. Franklin*, 380 F. Supp.2d 793, 798 (N.D. Tex. 2005). Plaintiffs' request is **DENIED** without prejudice to filing a motion that complies with the applicable rules of civil procedure and the local rules.

### IV.   MOTIONS UNDER 15 U.S.C. § 78u-4(b)(3)(B)

Provident and Defendants move to stay all to stay all discovery and other proceedings, and Plaintiffs move to allow particularized discovery, during the pendency of the motions to dismiss under 15 U.S.C. § 78u-4(b)(3)(B).[18]  (docs. 219; 221; 223) Because Defendants' motion to dismiss should be granted in part and denied in part, and it has been separately recommended that Provident's motion to dismiss be denied, Provident's and Defendants' motions to stay discovery and Plaintiffs' motion to allow particularized discovery are **DENIED as moot.**

### V.   RECOMMENDATION

Defendants' motion to dismiss for failure to state a claim should be **GRANTED** on the claims for common law fraud, fraud by nondisclosure, securities fraud, civil conspiracy, and breach of fiduciary duty, and **DENIED** on the claim for declaratory relief. All claims against McDermott, the fraud and civil conspiracy claims against Conestoga, and the breach of fiduciary

---

[18]15 U.S.C. § 78u-4 provides: "In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."

duty claim against CTS should be **DISMISSED with prejudice**, and the claim for declaratory relief against Conestoga should remain pending for trial. Partial judgment should be entered dismissing with prejudice all claims against McDermott.

      **SO RECOMMENDED** on this 23rd_day of November, 2022.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

      A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE